IN RE ESTATE OF WILMA R. ANDERSON, DECEASED. MARGARET A. WONDRA, APPELLANT, v. PLATTE VALLEY STATE BANK & TRUST COMPANY, TRUSTEE, ET AL., APPELLEES.

230 N. W. 2d 182

Filed May 29, 1975. No. 39795.

Brian R. Watkins and H. B. Muffly, for appellant.

Gary L. Hogg, Tye, Worlock, Tye, Jacobsen & Orr, Nate C. Holeman, and Munro, Parker, Munro & Grossart, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

CLINTON, J.

This is an appeal involving the estate of Wilma R. Anderson, deceased. Two issues are here for determination. The first is whether or not the appellant, Margaret A. Wondra, stepdaughter of Wilma R. Anderson and the principal beneficiary of her will, is within the category of persons entitled to the $10,000 exemption and the 1 percent inheritance tax rate provided by section 77-2004, R. R. S. 1943, or whether she comes within the category described in section 77-2006, R. R. S. 1943. The second issue involves the construction of the will of the decedent and requires a determination as to which provision of the will describes the residuary estate of the testatrix upon which, under the terms of its first article, the burden of the estate and inheritance tax falls.

Both the county court and the District Court determined that Margaret was not, under the evidence, within one of the categories described in section 77-2004, R. R. S. 1943. Both courts determined that only the "Residual Trust," created by provision A 2 of article VI of the will, was the residuary estate upon which by reason of article I the burden of the estate in inheritance taxes must fall. We reverse and remand with directions.

The appellees are Buffalo County, which has an inter-

est by reason of the inheritance tax involved, and two cousins of the decedent who are the beneficiaries of the "Farm Trust" created by provision A 1 of article VI of the will and whose interests will bear a portion of the tax burden if both trusts constitute the residuary estate.

Section 77-2004, R. R. S. 1943, applies to certain close relatives, including lineal descendents and to "any person to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent; Provided, that no one shall be considered a person to whom the deceased stood in the acknowledged relation of a parent unless he shall have been a member of the household of the deceased and shall have had his permanent home in the home of the deceased for at least five continuous years during his minority." Both the county court and the District Court found that the testatrix for a period of more than 10 years stood in the acknowledged relation of parent to Margaret. The lower courts found, however, that under the evidence Margaret had not been a member of the household of and had not had her permanent home in the home of the testatrix for a continuous period of 5 years during the minority of Margaret within the meaning of the proviso. In arriving at that conclusion the courts below were called upon to construe a provision of the statutes without having the benefit of any previous construction by this court and without the benefit of the construction of any similar proviso by a court of last resort of any other jurisdiction. Thus they were forced to rely solely upon the general rule of strict construction of statutes exempting property and legacies from taxation. Todd v. County of Box Butte, 169 Neb. 311, 99 N. W. 2d 245.

It is clear from the evidence that from the time the testatrix married Margaret's father until the death of the testatrix on August 21, 1971, there did exist between the testatrix and Margaret the acknowledged relationship of mother and daughter. The lower courts so

found and it is unnecessary to detail the evidence which fully supports such a finding. The determination of the issue at hand turns wholly upon whether or not the conditions of the proviso were met.

Evidence discloses that the plaintiff was born in Kearney, Nebraska, on December 20, 1915, and was an only child. Her parents were Ira Anderson and Ada Roslind Mercer Anderson. Her natural mother died in 1921. On June 19, 1924, Margaret's father married Wilma Ruth Crosley, the testatrix. At that time Margaret was 8½ years old. Immediately after the marriage Margaret, her father, and stepmother made their home with the testatrix' mother who was referred to as grandmother Crosley. Margaret thereafter referred to the testatrix as mother. The Crosley house remained the home of Mr. and Mrs. Anderson thereafter throughout their marriage until the death of Margaret's father many years later. The grandparents Mercer lived nearby. There was apparently some friction between the grandparents Mercer and grandmother Crosley because the latter thought Margaret was being spoiled by the former. In the summer of 1926 the grandparents Mercer took Margaret on a vacation trip to Oregon to the home of a maternal aunt. The Mercers left Margaret at her aunt's home with the consent of her father. Exactly how this came about is somewhat uncertain, but it is a reasonable inference that it was partly because Margaret liked it there where there were other children in the home and partly in order to relieve the tension between grandparents and to remove Margaret from any conflict. Margaret's father bore the entire cost of Margaret's support while she lived in Oregon and communication on a parental basis continued between Margaret and her father and stepmother during that time. About 2 years after Margaret's arrival in Oregon the grandparents Mercer moved to Oregon and Margaret moved from her aunt's home to that of the Mercers. She lived with them, continued in school, and was supported by her father.

In the spring or summer of 1930 Margaret's father and the testatrix made a trip to Oregon. Margaret then went with them on a vacation through the west and came back to Kearney with them where she stayed the remainder of the summer. In the fall she returned to Oregon for school. The same support arrangements and communications continued. Thereafter Margaret spent the school year in Oregon and the summers of 1931, 1932, and 1933 in Kearney. By the spring of 1934 she had completed her freshman year at the University of Oregon and then returned to Kearney for the summer. That fall she entered the University of Nebraska and attended at the University for 2 years, returning home to Kearney for the summer vacations, the holidays, and the various school breaks. On August 23, 1936, a few months before she reached 21 years of age, she married and thereafter had her own home.

The courts below concluded that although physical absence from the home and household of the acknowledging parent, while the child attended college, did not interrupt the continuity of her home with the testatrix, that the earlier physical absence while attending high school did. We, for reasons we elaborate later, conclude otherwise. Even if, for sake of argument, we accept Margaret's continued absence from Kearney from 1926 to 1930 as an interruption of the relationship to home and household of the testatrix, we believe that in the summer of 1930 the necessary relationship was reestablished within the meaning of the proviso and continued until Margaret married in August of 1936, a period of more than 5 continuous years.

The statutory requirement is that the child "shall have been a member of the household of the deceased and shall have had his permanent home in the home of the deceased" for at least 5 continuous years during minority. One usually thinks of the terms "household" and "home" as being free of ambiguity, but this is not true. The precise meaning can vary depending upon

the context in which the terms are used. This may be shown by the following examples. In Crossfield v. Phoenix Ins. Co., 77 N. J. Super. 476, 187 A. 2d 20, a burglary insurance policy case, it was held that temporary absence from the home does not interrupt the household membership, but that absence does if there is no intent to return to the family home. In Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, 35 N. J. 1, 170 A. 2d 800, it was held that residence under the same roof is not always required for a person to be of the same household. In Umbarger v. State Farm Mut. Auto. Ins. Co., 218 Iowa 203, 254 N. W. 87, it was held that family and household are "substantially synonymous terms." In that case a boarder was held not to be a member of the household. In Fay v. John Waldron Corp., 117 N. J. Law 123, 187 A. 140, a workmen's compensation case, the question was whether the decedent's children were members of his household. The children's mother died. The father placed the children with his sister and he also lived with her for a time. The sister married and moved elsewhere taking the children with her. Because of his employment the decedent could visit the children only on weekends. He supported the children continuously. The children were held to be members of his household. In Herbst v. Hansen, 46 Wis. 2d 697, 176 N. W. 2d 380, an automobile insurance case, it was held that, while residence under one roof is a factor to be considered in determining whether persons are members of the same household, a temporary absence with intent to return does not necessarily sever the relationship. We cite the foregoing cases simply to demonstrate that in order to determine as exactly as possible the meaning of such terms as used in the statute, we must bear in mind the purpose which the Legislature sought to accomplish.

It is significant that the Legislature used the term "permanent home." This, it seems, can only be in contradistinction to a temporary home. It is clear that if

Margaret had a *"permanent* home" it was with her
father and the testatrix. It is clear that neither her
residence with her aunt for about 2 years nor her resi-
dence with her grandparents Mercer was intended by
anyone as anything but a temporary arrangement. Only
her father could control the matter, and he did. The
Crosley home was his home until his death in 1946.
That was also the home of the testatrix. It was also
Margaret's permanent home from 1930 until her
marriage.

It seems clear that the language the Legislature used
was intended to prescribe a somewhat objective stand-
ard for determining the genuineness of the relationship.
This is borne out by the legislative history of the statute
and the proviso. From 1901 to 1953 this statute in-
cluded among the classes of persons coming within it
"any person to whom the deceased for not less than ten
years prior to death stood in the acknowledged relation
of a parent." In 1953 this language was omitted, leav-
ing just the specifically described close relatives enu-
merated. In 1957 the quoted language was restored to
the statute and the proviso at issue here was added. At
that time the chairman of the Judiciary Committee of
the Legislature stated the bill's purpose in the following
language: "In the present law, a foster child or step-
child is classed as a non-relative and allowed only a
$500 exemption. This bill would allow a $10,000 exemp-
tion to a qualified foster child or step-child upon the
theory that such person who had been accepted in ·a
home for a reasonable time should have the same exemp-
tion privileges as close relatives in the same family.
. . . The time qualification period is set at 10 years, and
the foster child must·have lived in the household of the
deceased for 5 continuous years of his minority. This
safeguard tends to deter irresponsible parties claiming
exemptions." In 1948 in the case of In re Estate of
Dowell, 149 Neb. 599, 31 N. W. 2d 745, we interpreted
the language later restored in 1957 to include persons

who would be coming within its terms even though not related by blood and had in that case applied the phrase to include a foster child.

In construing the statute as we do here, we do not believe we depart from the rule of strict construction of Todd v. County of Box Butte, *supra*. In that case the language taken in context was clear and could not be properly interpreted other than as it was.

In In re Downey's Estate, 182 N. Y. S. 223, the sole question was whether a legatee's stepmother had stood for not less than 10 years in the relation of parent to the legatee. The legatee was 5 when her father and stepmother married. She lived with them at least until she was 16. From her 7th to 10th year she attended a boarding school, going home on vacations. The New York court stated: "The fact that the legatee during a part of the time was absent from the home of her father ... I do not consider at all inconsistent with the relationship in question." In Herbst v. Hansen, *supra*, although involving an adult person and a context different from this case, the decision stands for the proposition that temporary absence does not always terminate household membership. That statement would seem to be true a fortiori in the case of a minor, who cannot independently determine her own home and household.

We hold, therefore, that Margaret was a member of the household of the testatrix and had her permanent home in the home of the testatrix for at least 5 continuous years during her minority within the meaning of section 77-2004, R. R. S. 1943.

The second question to be determined is whether the residuary estate of the testatrix consisted of all the property passing under article VI of the will, or merely that part of the property which passed into the "Residual Trust."

The cardinal rule in construing a will is to ascertain and effectuate the intention of the testator if such intention is not contrary to law. Dover v. Grand Lodge of Nebraska Ind. Order of Odd Fellows, 190 Neb. 169,

206 N. W. 2d 845. The intention is to be determined from the language of all the pertinent provisions of the will and, where applicable, the circumstances under which the will was made. Berning v. National Bank of Com. Tr. & Sav., 176 Neb. 856, 127 N. W. 2d 723.

Part of the ambiguity in the will of the testatrix arises from the language of article VI and part arises from certain language in article I, which is otherwise reasonably clear. Article I is as follows: "I direct that all of my just debts, funeral and testamentary expenses be paid as soon after my decease as conveniently may be done. I direct that all estate, inheritance, transfer, legacy or succession taxes, or death duties, which may be assessed or imposed with respect to my estate, or any part thereof, wherever situated, whether or not passing under my Will, including the taxable value of all policies of insurance on my life, and of all transfers, powers, rights or interest includable in my estate for the purpose of such taxes and duties, shall be paid out of my residuary estate, and if it be insufficient for such purposes, then out of my personal estate as an expense of probate and without apportionment."

Articles II, III, and IV make specific devises and bequests. Article V grants an option to purchase certain stock with the proviso that if the option is not exercised, "such stock shall become a part of my residuary estate."

Article VI contains an introductory paragraph as follows: "I give, devise and bequeath all of the rest, residue and remainder of my property and estate whether real, personal or mixed, wheresoever situated and to which I may be entitled in two trusts, to the Trustee hereinafter named to be held, administered and disposed of as follows." Then follow two subdivisions designated A and B. Subdivision A, after an introductory clause, contains two subdivisions designated 1 and 2 which create respectively the "Farm Trust" and the "Residual Trust." The introductory clause of A reads: "Said trusts shall continue for ten years," and then directs the trustee to

administer the property for the trust period and at the end of that period to distribute the property as thereafter provided.

Subdivision 1 of A reads: "My Trustee shall receive and hold in trust my farm to be known as the 'Farm Trust', described as follows:" (here follows the legal description of the farm). This subdivision then goes on to provide that the net income be distributed "equally to my cousins William C. Boon, Jr. and Carol Martin." It provides that if either dies during the trust, the income goes to the children of the deceased, if any, otherwise to the surviving cousin. If both die, the income becomes part of the "Residual Trust." Provisions identical to the foregoing are made for distribution of the corpus in the same contingencies. The last paragraph of subdivision 1 provides that, upon termination of the farm trust, distribution may be made in cash or in kind. It further provides that if the beneficiaries desire distribution in kind they shall notify the trustee "in writing on or before the date of termination," otherwise the trustee "shall proceed to sell" and distribute in cash.

Subdivision 2 provides in part: "The rest, residue and remainder of my estate, real, personal or mixed, . . . to be known as my 'Residual Trust' ", shall be managed, the income to be distributed "semi-annually to Phillip H. Proctor and Margaret Wondra equally." If Proctor dies during the trust the entire income goes to Margaret. If Margaret predeceases the testatrix or dies during the trust period, then her share of the income goes to her children or grandchildren by representation. It specifically names the children. This trust also expires 10 years after the death of the testatrix and is to be distributed to Proctor and Margaret in equal shares. The possible deaths of Proctor or Margaret are anticipated and in such event provision for distribution of corpus is made the same as in the case of income. Distribution is authorized in cash or in kind.

Article B prohibits any "donation or contribution from

either of the above trusts" and recites that the testatrix has made during her lifetime such contributions and donations 'as she desires.

Articles VII, VIII, and IX are administrative or definitional and do not shed any light as to the testatrix' intention with reference to the issue before us.

Article X defines the powers of the executor and trustee, the Platte Valley State Bank & Trust Company. Briefly summarized, the powers which might arguably shed some light on the testatrix' intention are:   (1) To retain property received regardless of its form, including real estate.   (5)   To sell "property, real or personal, held in trust."   (9)   To borrow money "and pledge or mortgage any trust assets as security."   (22)   To exercise extremely broad powers with reference to farms, including operating the same in the corporate form.

The will was executed on August 10, 1971.   The testatrix died on August 21, 1971.

Generally speaking, a residuary clause of a will is that clause which disposes of property, not usually specifically described, which has not been disposed of by the other provisions of the will.   96 C. J. S., Wills, § 796, p. 215.   Such a clause commonly, but not always, refers to the "rest, residue or remainder," or uses language of similar import.   96 C. J. S., Wills, § 796, p. 217.   As a matter of mechanical arrangement the residuary clause is often last, but need not necessarily be.   96 C. J. S., Wills, § 796, p. 217.   The above indicia are, of course, not conclusive, but are, without doubt, helpful in determining the intention of the testator.

As is evident from our summary of the will provisions, the only reason we need determine the residuary estate is because it is that part of the property which bears the tax burden.   The issue could be stated in another form: What property did the testatrix intend should bear the tax burden?

The introductory language of article VI earlier quoted is the usual and customary language introducing a resi-

duary clause and, standing by itself, would appear determinative. The ambiguity, however, arises when the language of other provisions is considered. The primary ambiguity arises from that part of article I which, after placing the tax burden on the residuary estate, says: "and if it be insufficient for such purposes, then out of my personal estate as an expense of probate and without apportionment." This language, when considered together with the fact that the initial corpus of the "Farm Trust" consists wholly of real estate can, with considerable force, be said to support the conclusion that the testatrix did not intend to burden the farm property with the tax obligation. Such a conclusion is reinforced by the further fact that the introductory language creating the "Residual Trust" also uses the language, "The rest, residue and remainder of my estate." Despite the reintroduction of this residuary estate language in A 2, we would have no hesitance in concluding that all the property passing under article VI is the residuary estate, except for the contingent direction to pay the taxes from the personal property if the residuary estate is insufficient. Is that particular phrase a "throw away" line and a mere inadvertence? Such a conclusion ought not to be casually reached.

Let us now look at considerations founded upon other provisions of the will which tend to lessen the force of the arguments founded upon the contingency direction. The will contains no provision requiring that the farm be preserved in kind as the trust corpus. The will, in fact, contains express authority authorizing the sale of the trust property and the will gives the beneficiaries no absolute veto on that power of the trustee. When the time approaches for distribution, the beneficiaries, then entitled to the distribution of the farm trust, may ask for and receive distribution in kind of the trust corpus in whatever form it may then be.

The power given to the executor and trustee to borrow upon and mortgage trust assets is significant. It

constitues a recognition that there may be obligations which can be satisfied by borrowing rather than by liquidation. Did the testatrix consider the death taxes among those obligations?

It is evident that Margaret is the principal beneficiary under the will. She received specific devises and bequests under articles II, III, and IV, as well as the "Residual Trust," subject, in the case of the trust, to the tax obligations which burden it. In the event Proctor predeceases the testatrix, Margaret (or her lineal descendants) receives the specific bequests of real estate made to Proctor in article IV. Margaret or her descendants receive the residuary trust if Proctor dies before distribution. If both Margaret and Proctor predecease the testatrix the specific bequests of real estate made to them in article IV become part of the "Residual Trust." Did the testatrix intend that the real estate be free of tax if it passes under article IV, but bear, as part of the residuary estate, the tax burden if it becomes part of the residual trust and passes to Margaret's descendants?

If the residuary estate consists of all property passing under article VI, then all four beneficiaries of the estate bear some portion of the tax burden and in proportion to their interests under article VI. If only the "Residual Trust" bears the tax burden, then that burden rests wholly on the testatrix' principal beneficiaries, those who apparently were foremost in her mind as evidenced by their otherwise favored position under the terms of the will. What did the testatrix intend? If the testatrix intended the "Residual Trust" only to be liable for all the death taxes, it would have been simple and precise to have said so in article I, rather than there using the more general term residuary estate, which term, except for the contingency provision of article I, would clearly refer to all the property passing in article VI.

This brings us back full circle to the significance of what we have referred to as the contingency provision.

That provision is in a sense anamolous and surplusage for there is in fact no significant amount of personal property which is not included in the "Residual Trust." The sole exception is a modest amount of household furnishings and personal effects which are the subject of the specific bequests in article III. The conclusion we draw is that the contingency provision in this will is not significant, much less conclusive, in determining the intention of the testatrix on the matter at issue. This conclusion is reinforced by the fact that the general terms used in the will in describing classes of property disposed of are not always used with precision. Provision A 2 refers to the property passing into the "Residual Trust" as containing real estate. No real estate is in fact included and could not be save for a change in the form of the testatrix' assets after the making of the will, or in the event of the death of both Margaret and Proctor before that of the testatrix. The contingency provision, as we earlier noted, refers to payment of death taxes from personal property which does not exist apart from that in the "Residual Trust."

It may be argued that the "Farm Trust," which consists of specifically described real estate, is a specific devise just as are the bequests in certain preceding articles and is therefore not part of the residuary estate. If the testatrix had so intended it would seem that she would have placed the same in a separate article and not included it in "The rest, residue and remainder of my estate." The mere fact that property is particularly described does not necessarily exclude it from the residuary estate. 96 C. J. S., Wills, § 797, p. 218. Let us use a homely example. Assume that a testator's residuary estate happens to consist of only black, blue, white, and red marbles. He says: I give all the rest, residue, and remainder of my estate as follows: (a) To John all the black marbles. (b) To Mary the remaining marbles. John's bequest is specifically described; Mary's is not. Yet both are part of the residuary estate.

For the reasons set forth, we conclude that it was the intention of the testatrix that all the property passing under article VI was her residuary estate and was to bear the tax burden. The factors which lead us to this conclusion we have analyzed and we now summarize: (1) The mechanical arrangement of the provision of the will and the language introducing article VI describe the usual residuary estate provisions. (2) If the testatrix had intended to charge the "Residual Trust" with the tax burden, it would have been accurate and precise to use that term in article I, but she did not. She chose to refer to the residuary estate. (3) The will provisions do not mandate the preservation of the farm in kind, but actually contemplate its change in form as the corpus of the "Farm Trust." (4) The will provisions, considered as a whole and taken together with the testatrix' relationship to her beneficiaries as evidenced by the will, indicate that it was the specific bequests and devises under articles II, III, and IV which were intended to be free of the tax burden. (5) The significance which the contingency provision of article I might otherwise have is lost because it seemingly refers to personal property which did not exist except for the residual trust. The contingent provisions for paying taxes from the personal estate is inconsistent with the facts of the property holdings of the testatrix as known to her when she made the will.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.