IN RE ESTATE OF ROLLO E. ACKERMAN, DECEASED.
COUNTY OF LANCASTER, NEBRASKA, APPELLANT, v. KATHERINE
G. POLICKY, APPELLEE.

550 N.W.2d 678

Filed July 26, 1996.   No. S-93-983.

Gary E. Lacey, Lancaster County Attorney, and Michael E. Thew for appellant.

John C. Hurd, of Wolfe, Anderson, Hurd, Luers & Ahl, for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

GERRARD, J.

The personal representative of the estate of Rollo E. Ackerman commenced this action to determine the inheritance tax due from Katherine G. Policky, a devisee under the will of Rollo Ackerman. The county court held that Policky should be taxed at the rate provided in Neb. Rev. Stat. § 77-2006 (Reissue 1990). On appeal, the district court reversed, finding that Policky should be taxed at the lower rate provided in Neb. Rev. Stat. § 77-2004 (Reissue 1990). We hold that the district court did not err in finding that Policky is a person to whom the deceased stood within the acknowledged relation of a parent during the last 10 years of his life, as provided in § 77-2004, and we affirm the judgment of the district court.

## FACTUAL BACKGROUND

On February 2, 1992, Rollo E. Ackerman, a widower with no children, died in Lancaster County, Nebraska. Policky, the appellee herein, received $162,749.73 in nonprobate property from Rollo Ackerman's estate. In addition, Rollo Ackerman's will provided for a bequest of one-half of the residue of the estate, approximately $138,342.54, to Policky. Rollo Ackerman stated in his will that "I am giving this share to Katherine G. Policky to show my appreciation for all of the favors, assistance and help that she has given my wife and me over the years and to myself after my wife's death." Rollo Ackerman bequeathed the remaining one-half of the residue of the estate to Tyler Mundall, stating, "I consider Tyler to be like a son to me."

Upon petition by the personal representative of the estate, the county court determined the inheritance tax rate for all of the devisees except Policky, finding, among other things, that the inheritance of Mundall should be taxed pursuant to § 77-2004 as a person to whom Rollo Ackerman stood in the "acknowledged relation of a parent" for the 10 years preceding his death. The issue of the tax rate on the inheritance of Policky was taken under submission by the county court, and a trial was had thereon.

At trial, the testimony of Policky established the following: Policky grew up in Friend, Nebraska, and was living there with her mother when she first met Rollo Ackerman and his wife, Helen, in 1967, while on a visit to Lincoln, Nebraska. At that time, Policky was 16 years old, and her parents were divorced. Thereafter, Policky visited the Ackermans twice a month until graduation from high school. During these visits, Policky and the Ackermans were involved in various activities, such as going out to eat, working in barber and beauty shops owned by the Ackermans, or visiting the home of the Ackermans. Policky would often spend the night at the Ackermans' during these visits rather than returning home to Friend.

Following high school graduation in 1969, Policky entered the University of Nebraska at Lincoln as a full-time student. Policky had no further contact with her biological mother or father. Policky lived on campus during her first year at the university and in university-approved housing thereafter—she did not reside at the home of the Ackermans. Policky received no financial support from her family during this time and did not have any scholarships, grants, or loans. She worked part time in various locations as a cashier. The Ackermans paid for all of her schoolbooks and clothing, and for the majority of her meals or groceries. The Ackermans also paid whatever tuition and medical expenses Policky incurred which she could not cover from her part-time job income. In addition, Policky did not own a car while attending the university and would either borrow the Ackermans' car when necessary, or would be transported by them.

During the summer months, Policky would stay at the Ackerman home approximately half of each month and would work in the shops owned by the Ackermans, perform chores around their acreage, or ride horses kept on the Ackermans' land. During the school year, Policky would meet the Ackermans at their shop around noon, eat lunch with them, work in the shop until closing time at 6 p.m., and go to dinner with the Ackermans before returning home to her residence. Policky was not paid for her work in the shop. On Saturdays, Policky would follow the same schedule, except that

dinner would usually be followed by some sort of entertainment activity. On Sundays, Policky would eat breakfast with the Ackermans, go to church with them, have lunch, ride horses at their home or perform chores around the house, and return to her residence in the afternoon.

Policky spent her holidays at the Ackerman home and took vacations with them during the year, which vacations were paid for by the Ackermans. With regard to discipline, Policky testified that the Ackermans required her to check in with them as to her hours, insisted on meeting her boyfriends, and would generally tell her what she could and could not do.

Following graduation from the university in 1973, Policky continued to attend classes, but became employed by the university on a schoolyear basis. As a result, Policky was not as financially dependent on the Ackermans as before. However, the Ackermans continued to help her with paying for school expenses, purchasing vehicles, and obtaining insurance. Policky continued to vacation with the Ackermans, spend holidays with them, ride horses at their acreage, and help with household chores.

In 1978, Helen Ackerman died, and at that time Policky moved into the home next door to the Ackerman acreage, which home was owned by Rollo Ackerman. Policky remained in this house until 1981, when she moved to an apartment, and she eventually purchased her own home in Lincoln. Policky did not pay any rent while living next door to the Ackerman acreage, but cared for Rollo Ackerman on a daily basis when not at work, preparing meals for him and managing the household tasks. Policky continued to spend holidays and vacations with Rollo Ackerman. During the last months of his life, Rollo Ackerman was ill, and Policky took care of him, or made provisions for his care, on a daily basis.

At trial, testimony was also received from Nancy Bauers, Richard Egger, and Vicki Munden, who were all acquaintances of Rollo Ackerman. Each of these parties testified that in conversations with Rollo Ackerman, he referred to Policky and Mundall as "his kids." Furthermore, these parties often observed Policky performing chores around the Ackerman home.

In addition, various written documents were offered and received at trial in which Rollo Ackerman referred to Policky as his daughter, which documents included an insurance form dated February 15, 1991; two outpatient registration forms dated February 22, 1991, and August 23, 1991, respectively; and a durable power of attorney executed by Rollo Ackerman on October 4, 1991.

The county court issued an order on February 8, 1993, finding that the inheritance tax due from Policky should be computed pursuant to § 77-2006 rather than § 77-2004. The county court concluded that although the relationship between Rollo Ackerman and Policky was a very loving and close relationship, Rollo Ackerman did not view Policky as his "daughter" for purposes of § 77-2004. The court based this conclusion on the fact that Policky always maintained a residence separate from the Ackermans and that the will of Rollo Ackerman did not refer to Policky as his daughter, while it did refer to Mundall and Leroy Mares, two other devisees not related to Rollo Ackerman, as "sons." The trial court also found that the extensive work performed by Policky without pay implied a "quid pro quo" arrangement between the parties, rather than the relationship of a father and daughter.

The order of the county court was appealed by Policky. On appeal, the district court reversed, holding that the inheritance of Policky should be taxed pursuant to § 77-2004 as that of a person " 'to whom the decedent, for not less than ten years prior to his death stood in the acknowledged relation of a parent . . . .' " The district court found that the absence of residence in the Ackerman household did not bar Policky from establishing the necessary parental relationship and that the additional factors of assumption of responsibility for support, exercise of parental authority and discipline, provision of advice and guidance, and shared time and affection weighed in favor of such relationship. Furthermore, the district court found that although the will of Rollo Ackerman did not refer to Policky as his daughter, various documents received in evidence did so refer to her, and this acknowledged relationship was supported by the testimony of witnesses at trial. Based on these findings, the district court held that Policky had sus-

tained her burden of proof under § 77-2004 and reversed the judgment of the county court. The judgment of the district court was appealed by the county to the Nebraska Court of Appeals, and the matter was removed to this court on our own motion in order to regulate our caseload and that of the Court of Appeals.

## ASSIGNMENTS OF ERROR

The county asserts that the district court erred in holding that Policky sustained her burden of proving she is a person to whom Rollo Ackerman stood in an acknowledged relation of a parent for at least 10 years prior to his death and in reversing the factual determinations of the trial court, which were supported by substantial evidence.

## STANDARD OF REVIEW

The scope of review in an appeal of an inheritance tax determination is review for plain error appearing on the record. Neb. Rev. Stat. §§ 25-1911 (Reissue 1995) and 25-2733 (Reissue 1989). See, *In re Estate of Stanton*, 245 Neb. 942, 516 N.W.2d 586 (1994); *In re Estate of Detlefs*, 227 Neb. 531, 418 N.W.2d 571 (1988). Factual findings necessary in determining if the requisite acknowledged parent-child relationship of § 77-2004 exists should be reviewed for sufficient evidence and should not be disturbed on appeal unless clearly wrong. *In re Estate of Massie*, 218 Neb. 103, 353 N.W.2d 735 (1984), *overruled on other grounds, In re Estate of Price*, 223 Neb. 12, 388 N.W.2d 72 (1986).

## ANALYSIS

Section 77-2004 provides that "any person to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent" shall receive an inheritance tax exemption of $10,000 and shall be taxed at the rate of 1 percent of the clear market value of the property thereafter. However, if a taxpayer does not fit within the ambit of § 77-2004 or within Neb. Rev. Stat. § 77-2005 (Reissue 1990), which section is not relevant to the present case, the taxpayer's inheritance is taxed pursuant to § 77-2006 at a progressive rate of 6 to 18 percent. Thus, a finding that § 77-2004 is

the applicable statutory section, as opposed to § 77-2006, results in a much lower inheritance tax rate on the legacy left to the taxpayer. In this case, the county asserts that the inheritance received by Policky should be taxed according to § 77-2006, while Policky claims that she should be taxed at the lower rate provided in § 77-2004.

In its first assignment of error, the county asserts that the district court erred in holding that Policky sustained her burden of proof under § 77-2004. Statutes exempting property from inheritance tax should be strictly construed, and the burden is on the taxpayer to show that he or she clearly falls within the language of the statute. See, *Todd v. County of Box Butte*, 169 Neb. 311, 99 N.W.2d 245 (1959); *In re Estate of Rudge*, 114 Neb. 335, 207 N.W. 520 (1926). Therefore, the burden of proof at the trial level was on Policky to establish that she was a person "to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent."

In order to determine whether the evidence establishes such a parental relation, it is necessary to analyze the scope of the statutory language. This language has been held to extend beyond blood relatives to persons standing "in loco parentis" with the taxpayer. See *In re Estate of Dowell*, 149 Neb. 599, 31 N.W.2d 745 (1948). In addition, residency in the testator's home is not required, and, in fact, an express requirement to this effect has been eliminated from the statute. See *Wondra v. Platte Valley State Bank & Trust Co.*, 194 Neb. 41, 230 N.W.2d 182 (1975). Also, compare § 77-2004 with its predecessor, § 77-2004 (Reissue 1986). However, this court has never delineated any other specific criteria to determine whether a person stands in loco parentis to a person within the context of § 77-2004.

In *In re Estate of Quinn*, 1 Neb. App. 1025, 510 N.W.2d 488 (1993), a case decided in the interim between the county court and district court decisions in the instant case, the Court of Appeals considered and discussed specific criteria in determining whether a person stands in loco parentis to another person within the context of § 77-2004. In *In re Estate of Quinn*, the Court of Appeals noted that the court in *Estate of*

*Larson*, 106 Cal. App. 3d 560, 166 Cal. Rptr. 868 (1980), interpreted the California statutory phrase "acknowledged relationship of a parent" to connote a status of in loco parentis, which refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formalities necessary to legal adoption. It should be noted that this definition is almost identical to Nebraska case law on the subject of in loco parentis. See, *Cornhusker Christian Ch. Home v. Dept. of Soc. Servs.*, 227 Neb. 94, 416 N.W.2d 551 (1987), *appeal dismissed* 488 U.S. 919, 109 S. Ct. 298, 102 L. Ed. 2d 317 (1988); *Austin v. Austin*, 147 Neb. 109, 22 N.W.2d 560 (1946). The Court of Appeals goes on to note that the *Estate of Larson* court stated that comparison of the California statutory phrase "acknowledged relationship of a parent" to the concept of in loco parentis might suggest to some that the relationship must be precisely the same as a biological parent and child. However, the *Estate of Larson* court held that the phrase is not so narrow in its meaning. Citing *Estate of Wilts*, 80 Cal. App. 3d 599, 145 Cal. Rptr. 759 (1978), the *Estate of Larson* court said, "The law recognizes that although a natural parent-child relationship may exist elsewhere, if the parties regard each other in all of the usual incidents and relationships of family life as parent and child, the benefits" of the inheritance tax statute flow. 106 Cal. App. 3d at 564, 166 Cal. Rptr. at 870.

The *Estate of Larson* court also reviewed several factors to determine if a person is to be acknowledged as a parent in a situation such as that before us. Those factors are as follows: reception of the child into the home and treatment of the child as a member of the family, assumption of the responsibility for support beyond occasional gifts and financial aid, exercise of parental authority in discipline, relationship by blood or marriage, advice and guidance to the child, and sharing of time and affection. It should be noted that the *Estate of Larson* court also addressed the question of whether total or exclusive financial support is required. Citing *In re Estate of Dowell, supra*, and cases from several other jurisdictions, the *Estate of*

*Larson* court held that a person may stand in loco parentis despite other sources of support for the child.

In *Austin v. Austin, supra*, we held that the assumption of the relationship of in loco parentis to a child is a question of intention, which may be shown by the acts and declarations of the person alleged to stand in such relationship. While that particular case did not deal with § 77-2004, it is useful, since it dealt with the concept of in loco parentis in the context of a case involving inheritance issues.

As we discussed in *In re Estate of Dowell*, 149 Neb. 599, 31 N.W.2d 745 (1948), this portion of § 77-2004 and other related provisions have been adopted from a similar statute of the State of New York. In determining the construction of these Nebraska provisions, we look to the construction placed upon their counterparts by the courts of the State of New York, in the absence of contrary intention being expressed by our Legislature. With this principle in mind, the Court of Appeals, in *In re Estate of Quinn*, 1 Neb. App. 1025, 510 N.W.2d 488 (1993), examined *Matter of Beach*, 154 N.Y. 242, 48 N.E. 516 (1897). The *Matter of Beach* court found that the phrase "any person" in a statute similar to § 77-2004 includes both minors and adults. The fact that a parent-child relationship may start when both parties are adults, or may begin when the child is a minor and continue after that child reaches adulthood, is not a bar to a claim made under the relevant statute. Our determination is not restricted, therefore, to an examination of only childhood years, but also adult years of a devisee.

We conclude that the specific criteria discussed by the Court of Appeals in *In re Estate of Quinn* (citing *Estate of Larson*, 106 Cal. App. 3d 560, 166 Cal. Rptr. 868 (1980), and *Matter of Beach, supra*) would be helpful to a trial court in determining when an "acknowledged relation of a parent" exists for purposes of § 77-2004. In addition to these criteria, however, we conclude that relevant written documentation evincing the decedent's intent, including, but not limited to, a will, should be considered by a trial court in making its determination of an acknowledged relation of a parent under § 77-2004. There is no single criterion or test in making such a determination. The trial court should consider all pertinent factors in arriving

at that legal conclusion. Any list of suggested criteria is not meant to be exhaustive, nor will every factor necessarily be present in each case; however, we conclude that the following factors serve as appropriate guideposts to the trial court in making a determination of an acknowledged relation of a parent under § 77-2004: (1) reception of the child into the home and treatment of the child as a member of the family, (2) assumption of the responsibility for support beyond occasional gifts and financial aid, (3) exercise of parental authority and discipline, (4) relationship by blood or marriage, (5) advice and guidance to the child, (6) sharing of time and affection, and (7) existence of written documentation evincing the decedent's intent to act as parent. The district court, which sat as an appellate court in this case, did consider these factors in reviewing the case for plain error appearing on the record.

Applying the criteria set forth above to the instant case, we conclude that the district court was correct in its determination that, as a matter of law, Policky is a person to whom Rollo Ackerman stood within the acknowledged relation of a parent within the last 10 years of his life. First, while it is true that Policky did not reside at the Ackerman home and therefore technically may not have been "received into the home" of Rollo Ackerman, the testimony of Policky and witnesses on her behalf clearly establishes that she was treated as a member of the Ackerman family. Policky spent the vast majority of her time with the Ackermans and was given responsibility and advice as would have been given a member of the family. Furthermore, given Policky's age and her status as a college student, it was not unusual that Policky would reside on her own. Under these circumstances, we conclude that it is appropriate that residency, or lack thereof, not be given undue weight by the trial court in making its determination.

Second, the record establishes that the Ackermans assumed responsibility for Policky's support beyond occasional gifts and financial aid. The testimony at trial revealed that the Ackermans paid for all of Policky's clothing and books and for a large portion of her meals and tuition. No support was received by Policky from her biological family. Given the limited income Policky earned from her part-time job as a cashier

while at the university, the Ackermans essentially supported her during that time. Even after Policky obtained a job at the university, the Ackermans continued to help pay for school expenses, vacations, vehicles, and insurance. This support was clearly beyond "occasional."

The county asserts that Policky failed to sustain her burden of proof on the issue of support since there is no indication that the Ackermans intended to be legally obligated for Policky's support or that they would have provided assistance to Policky absent her work in the shop. This argument misses the mark. Although the requisite "acknowledged relation of a parent" is similar to that of in loco parentis, there is no requirement of legal obligation for support. In fact, in the case of an adult, legal obligation for support would rarely, if ever, exist. Consistent with the reasoning in *Matter of Beach*, 154 N.Y. 242, 48 N.E. 516 (1897), we conclude that the fact that a taxpayer is an adult rather than a minor at the time the relationship with the testator commences should not prevent a finding of an acknowledged relation of a parent under § 77-2004. In light of this conclusion, "support," as meant in the criteria herein set forth, does not require a legal obligation for support of the taxpayer. Furthermore, although Policky worked in the Ackermans' shops and at their home on a regular basis, there was no express or written agreement of support in exchange for services, and the funds and amenities provided to Policky by the Ackermans would seem to far exceed what she would have made as a "salary" for such work. Therefore, the district court was correct in its determination that the county court erred when it concluded that the relationship between Rollo Ackerman and Policky amounted to nothing more than a "quid pro quo" relationship.

It is also evident that the Ackermans exercised parental authority and discipline over Policky. The testimony of Policky at trial established that the Ackermans insisted on meeting her boyfriends, monitored her hours, and told her what she could and could not do. The county asserts that such supervision is "a far cry from the exercise of parental authority and discipline." Brief for appellant at 22. However, this assertion appears to go more toward the level of discipline rather than

to whether parental discipline actually existed. Given Policky's age, it is not unusual that the level of discipline was slight. Such would be true of any parent-child relationship in which the child is a college student establishing his or her own independence. Furthermore, there was no evidence indicating that the Ackermans were not the primary source of discipline in Policky's life.

The county also asserts that the district court failed to consider the factor of relationship by blood or marriage in reaching its decision. In regard to this factor, the district court stated that "Nebraska does not require such a relationship and, thus, it is not a pertinent factor in this discussion." It is true that a relationship by blood or marriage is not required for purposes of § 77-2004. See *In re Estate of Dowell*, 149 Neb. 599, 31 N.W.2d 745 (1948). Given the law in Nebraska on this issue and the context of the instant case, we conclude that the district court's cursory treatment of this factor was warranted.

The remaining factors of advice and guidance and of sharing of time and affection were not disputed by the county and are clearly established in the record. Finally, although the language of the will does not refer to Policky as the "daughter" of Rollo Ackerman, the written documents admitted in evidence do so refer to her, and thereby negate the effect, if any, of the absence of explicit language in the will acknowledging the true nature of the relationship between Rollo Ackerman and Policky.

In its second assignment of error, the county asserts that the district court erred in reversing the factual determinations made by the county court, which were supported by substantial evidence of record. After reviewing the record, we conclude that this assignment of error is without merit. In reaching its decision, the county court relied almost exclusively on the language of the will and the fact that Policky maintained a residence separate from the Ackermans. However, as recognized by the district court, both of these factors have been determined to be not controlling under Nebraska law in regard to § 77-2004. See, *In re Estate of Stanton*, 245 Neb. 942, 516 N.W.2d 586 (1994); *Wondra v. Platte Valley State Bank & Trust Co.*, 194 Neb. 41, 230 N.W.2d 182 (1975). On ques-

tions of law, an appellate court has an obligation to reach its own conclusions independent of those reached by the lower courts. *Kelley v. Benchmark Homes, Inc., ante* p. 367, 550 N.W.2d 640 (1996); *Scholl v. County of Boone, ante* p. 283, 549 N.W.2d 144 (1996). For the reasons set forth above, it is clear that the district court did not disturb the factual findings of the county court, but instead found that the facts supported a different conclusion of law with regard to the application of § 77-2004.

## CONCLUSION

Accordingly, the judgment of the district court that the county court erred as a matter of law in finding that Policky failed to sustain her burden of proof under § 77-2004 is hereby affirmed.

AFFIRMED.