IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE ESTATE OF BORT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE ESTATE OF GEORGE BORT, DECEASED.

DAVID GARCIA, PERSONAL REPRESENTATIVE OF THE ESTATE OF GEORGE BORT, APPELLEE,

V.

DOUGLAS COUNTY, NEBRASKA, APPELLANT.

Filed October 28, 2025.    No. A-24-871.

Appeal from the County Court for Douglas County: JEFFREY L. MARCUZZO, Judge. Affirmed.

Donald W. Kleine, Douglas County Attorney, and Elizabeth A. Shudak and Amy E. Garreans for appellant.

James R. Place, of Place Law Office, for appellee.

PIRTLE, BISHOP, and FREEMAN, Judges.

BISHOP, Judge.

### INTRODUCTION

The county court for Douglas County found that the decedent George Bort acted and stood in loco parentis to David Garcia and therefore Garcia was entitled to a preferential "Class I" inheritance tax rate for property he inherited from Bort. Douglas County appeals, arguing the evidence was insufficient to establish such a relationship. We affirm.

### BACKGROUND

Bort, 74 years old, died testate on January 15, 2021. A copy of his 2013 will was filed in the county court on January 28, 2021. Bort's will named Garcia as personal representative and as the sole beneficiary of his estate.

- 1 -

In July 2024, Garcia filed a "Motion to Determine *In Loco Parentis* and Class 1 Designation on Final Inheritance Tax Determination." Garcia alleged: Bort was a single man with no children; he and Bort met in approximately December 1997 when Garcia's mother purchased a residence next door to Bort; he and Bort developed a father/son relationship and maintained that relationship for 23 years until Bort's death in January 2021; and Bort named Garcia as the sole heir in his last will and testament dated December 26, 2013. Pursuant to Neb. Rev. Stat. § 77-2004 (Cum. Supp. 2024), Garcia requested that the county court enter an order determining that Bort stood in loco parentis to Garcia and, therefore, Garcia should be considered a "Class 1 Designation on the Final Inheritance Tax Determination."

A hearing on Garcia's motion took place on November 1, 2024.

EVIDENCE PRESENTED AT HEARING

Garcia, 33 years old, testified that he graduated from high school in 2009, subsequently obtained his bachelor's and master's degrees, and was a mental health practitioner.

Garcia first met Bort in 1997 when Garcia, along with his mother and younger brother, moved into the house next door to Bort in Omaha, Nebraska; Garcia was 7 years old at the time. (Garcia's sister was later born while the family was living next door to Bort.) Bort was single and had no children. From 1997 to 2000, Garcia would see Bort outside and they "would say hi from afar."

From 2000 to 2005, Garcia was 10 to 15 years old. He and Bort "started getting a lot closer," they "were talking frequently outside of [Bort's] house" and "gained a lot of trust." It was "very common" for Garcia's mother to take food to Bort or Bort would have dinner at Garcia's house. Bort would take Garcia's family out to eat as well; "We would go pretty frequently as a family and then, sometimes, just him and I, which was nice." Garcia mowed Bort's lawn, helped him with landscaping and snow removal, and "[j]ust anything, really, he needed help with." Bort "was always working on his car" and taught Garcia about mechanics and how to drive. (Bort also helped teach Garcia's brother how to drive.) Garcia said, "We talked about everything," had "man-to-man conversations about . . . the birds and the bees," he "[t]aught me about finances and . . . his experiences in the military," and he "just showed me a lot of love and gave me a lot of wisdom." Bort "was the one that kept motivating me to do well" in school, and he "wanted to know if I was doing well, checking in on grades." When Garcia and his brother got home from school, his mother would be at work. Bort "was always outside," would say hello, ask how they were doing, "give us a dollar, pretty frequently," and "just check in on us" before he would go back inside of his house; "it was a very common routine where I felt like he was just making sure we got home okay."

From 2006 to 2010, Garcia was 16 to 20 years old. By that point, Garcia was interacting with Bort "every other day," "[i]f it wasn't at his house or in our house, it was a phone call," and Garcia felt like Bort "was family" and "a father figure." (Garcia did not know his own father.) Garcia's family "all" checked on Bort. In 2006, there was a domestic violence incident involving Garcia's mother and her partner, and Garcia's mother "was scared" and "went over to [Bort's]"; "we trusted [him]." After that, Bort's vigilance "increased quite a bit" and "he was a . . . protector," and "[a]ll of us felt safer because he was there." Bort "started calling me son" and "one day, you know, he said, 'You can call me Pops.'" Garcia "already felt like that was kind of [their]

relationship anyway, so to call someone Pops was -- was powerful," and from then on, he called Bort "Pops."

On cross-examination, Garcia was asked if Bort exercised any authority over him. Garcia responded, "I respected him" and "I felt like I had to listen." And when asked if Bort had any rules that Garcia had to abide by, he responded, "just kind of treating people well and being smart." If Garcia got in trouble with his mother, she would talk to Bort, "kind of let him know a little bit, not a lot," and then "[Bort] would then kind of like give me his two cents in a way that only he could." Garcia said, "[I]f I felt [Bort] was disappointed, that was -- to me, that was a lot," "[t]hat was discipline in itself." And when Garcia got into a fender-bender in high school, Bort told him it would be a while before he let him drive his (Bort's) Cadillac; "I took it as . . . discipline, 'cause I really enjoyed driving around with him."

When Garcia went to college in Lincoln, Nebraska, he would go home every weekend or every two weekends. He was "a bit worried" about the wellbeing of his mother and siblings, but "[w]e had [Bort] next door, so that gave me a . . . sense of comfort." Bort called Garcia "[a]t least once a week," "[s]ometimes more." In October 2010, Bort sent a hand-written letter to Garcia at his dormitory. Bort began the letter "Son," and closed the letter with "Your Dad"; the letter and envelope were received into evidence. In another undated letter received into evidence, Bort began with "David (Son)," and closed the letter with "George." Garcia said Bort included $20 or $40 in the letters.

When asked if Bort ever attended any of his graduation events, Garcia responded, "No, not the actual events, but we always had parties at the house celebrating graduations, birthdays[,] [and] [Bort] was present at all of those." Bort gave Garcia money "[e]very now and then," and gave him gifts "[e]very holiday, every Christmas, graduations, things like that."

From 2011 to 2015, Garcia was 21 to 24 years old. Garcia was asked if there was ever a time when he had a conversation with Bort regarding Bort's will and durable powers of attorney for financial and healthcare matters. Garcia responded that "around" 2013 or 2014, Bort "just kind of randomly in our conversation, he kind of said, by the way, you know, when and if something happens to me, like, I want you to be the one to take care of all this stuff." Garcia later learned that Bort had appointed him in his durable power of attorney for financial matters and healthcare. Copies of the durable power of attorney documents were received into evidence; both documents were signed and notarized on December 26, 2013, and appointed "my friend DAVID GARCIA" to serve as attorney-in-fact. Garcia never needed to exercise his authority under the durable powers of attorney.

Garcia's counsel asked the county court to take judicial notice of Bort's will that was filed with the court on January 28, 2021. Douglas County had "[n]o objection" and the court took judicial notice "of the court file," including Bort's will.

Garcia was asked if Bort ever told him why he was giving him all of his property. Garcia responded, "He told me because we were family," and "he was very adamant about the government not getting his stuff."

From 2016 until Bort's death in 2021, Garcia was not living in his family's home next door to Bort. However, he continued his relationship with Bort. When asked if he made any observations about Bort's health and wellbeing in "2018, 2019," Garcia responded, "Yeah, . . . his health was declining." As a result, Garcia went to Bort's home more often. Bort had appointments at the

veterans hospital two to three times each month, and Garcia drove Bort to those appointments; depending on how long the appointment was going to take, Garcia would either wait for Bort outside or in the waiting room, or he would drop him off and come back to pick him up after the appointment. Bort "always offer[ed] to pay for the rides," but Garcia "always declined." In 2020, Bort was hospitalized at the veterans hospital in Omaha for "maybe three weeks or so," and then he was transferred to the veterans hospital in Grand Island, Nebraska, "because of his condition." Garcia and his mother visited Bort twice in Grand Island. Bort called Garcia from Grand Island and Garcia recorded the call because "I kind of had a feeling or I don't know if you can call it a premonition, but . . . I just wanted to keep his voice with me forever" and "I wasn't sure how long he had."

A transcript of the phone call was received into evidence. The first page of the exhibit states that the phone call took place on December 7, 2020. During that phone call, Bort referred to Garcia as "son," said "I really miss you guys a lot," and "I got to tell you[,] [y]ou're my family now." Bort also told Garcia where to find some silver dollars in his home "in case something does happen to me," and told Garcia, "I want you to take it before the government gets involved"; Bort thought the coins could be "worth a lot" and wanted them to go to Garcia and his family. At the end of the call, Garcia and Bort exchanged "I love you[s]."

Garcia did not recall any other conversation he had with Bort after the recorded call before Bort passed away at the hospital in Grand Island. According to Garcia, Bort's "[o]nly request" with respect to his funeral and burial "was that he wanted to be buried next to our family, 'cause he -- he was a part of our family." Bort was buried next to Garcia's uncle.

Garcia's mother testified that, in the beginning, "I was a little bit scared or careful with my kids not getting near [Bort]" because "he was a single person, older than all of us" and she never saw "other people visiting him or family members or parties or anything" and he was "always, like, smoking and drinking." However, "over time he became a different person," "he started coming out more" "and started talking to us whenever he [saw] us." Later, during a domestic incident with her partner, she went to Bort and asked him for help; "He opened the door, and he -- he said, 'You stay here until the police get[] here.'" Garcia's mother said that Bort "helped [her] a lot" with Garcia. "Any time that I felt like I wasn't doing my job because I was not that male figure that [Garcia] needed," she would talk to Bort and then he would talk to Garcia.

Garcia's mother testified that, over time, Bort joined the family at their house for meals. "[Q]uite a few years ago . . . he gave me these two little pictures" of himself and said to "put it on [our] wall" with our family photos because he "wanted to be with my family." Bort's photo is "still" on the wall in her home. She said that Bort asked to be buried with her family "because he considered us his family." When Bort was sick, she asked him if there was anyone she could call, and he said, "'No, you are my only family.'"

COUNTY COURT'S FINDINGS AND ORDER

After hearing all the evidence and closing arguments, the county court stated on the record:

[F]irst of all, the burden of proof is slight, to say the least. You know, it's by a preponderance of the evidence.

And based upon what I've heard here today and the evidence I've seen is that Mr. Bort did consider himself as a father figure. You know, by treating [Garcia] as a -- as a

member of the family; exercising control, authority, discipline; the advice and guidance; the immeasurable sharing of time and affection. The notes, while I wish they were better, they -- I think they do offer more evidence that Mr. Bort did consider [Garcia] to be a -- a member of the family, a child, so to speak. And then, you -- his last -- his last hurrah, so to speak, is wanting to be buried with the family. That's where he's buried. You -- kind of hard not to argue with that one.

But based upon the, yeah, a preponderance of the evidence received, the testimony the Court's heard, I find that Mr. Garcia has sustained his burden, and that I do find that, for purpose [sic] of Nebraska Revised Statute 77-2004, that [Garcia] should be designated as a Class I beneficiary.

The court entered its written order that same day, finding that Bort acted and stood in loco parentis to Garcia for purposes of § 77-2004 and therefore Garcia should be designated as a "Class I" beneficiary.

Douglas County appeals.

## ASSIGNMENTS OF ERROR

Douglas County's brief contains no designated assignments of error section. As such, it does not comply with appellate court rules. See Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2022).

Douglas County's brief does contain headings in the argument section which allege error by the county court, but argument headings are insufficient. The Nebraska Supreme Court has consistently rejected headings in the argument section as a sufficient substitute for assignments of error contained in the proper place and properly designated. See *County of Lancaster v. County of Custer*, 313 Neb. 622, 985 N.W.2d 612 (2023). Where the assignments of error consist of headings or subparts of arguments and are not within a designated assignments of error section, an appellate court may proceed as though the party failed to file a brief, providing no review at all, or, alternatively, may examine the proceedings for plain error. *Id.* We will review for plain error.

## STANDARD OF REVIEW

Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Id.*

## ANALYSIS

### APPLICABLE LEGAL PRINCIPLES

Section 77-2004 states, in relevant part:

(1) In the case of a father, mother, grandfather, grandmother, brother, sister, son, daughter, child or children legally adopted as such in conformity with the laws of the state where adopted, any lineal descendant, any lineal descendant legally adopted as such in conformity with the laws of the state where adopted, *any person to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent*, or the spouse or surviving spouse of any such persons, the rate of tax shall be:

(a) For decedents dying prior to January 1, 2023, one percent of the clear market value of the property received by each person in excess of forty thousand dollars; and

. . . .

(2) Any interest in property, including any interest acquired in the manner set forth in section 77-2002, which may be valued at a sum less than or equal to the applicable exempt amount under subsection (1) of this section shall not be subject to tax. . . .

(Emphasis supplied.) Inheritance tax rates are higher for other types of beneficiaries. See Neb. Rev. Stat. §§ 77-2005 and 77-2006 (Cum. Supp. 2024). Statutes exempting property from inheritance tax should be strictly construed, and the burden is on the taxpayer to show that he or she clearly falls within the language of the statute. *In re Estate of Hasterlik*, 299 Neb. 630, 909 N.W.2d 641 (2018).

The following factors serve as appropriate guideposts to the trial court in making a determination of an acknowledged relationship of a parent under § 77-2004: (1) reception of the child into the home and treatment of the child as a member of the family, (2) assumption of the responsibility for support beyond occasional gifts and financial aid, (3) exercise of parental authority and discipline, (4) relationship by blood or marriage, (5) advice and guidance to the child, (6) sharing of time and affection, and (7) existence of written documentation evincing the decedent's intent to act as parent. *In re Estate of Ackerman*, 250 Neb. 665, 550 N.W.2d 678 (1996). However, any list of suggested criteria is not meant to be exhaustive, nor will every factor necessarily be present in each case. *Id.* A trial court should consider all pertinent factors in arriving at that legal conclusion. *Id.*

NO PLAIN ERROR

Douglas County contends that the county court erred in determining that Bort stood in loco parentis to Garcia for not less than 10 years prior to Bort's death, thus classifying Garcia as a "Class I beneficiary" under § 77-2004 (1 percent tax rate) for purposes of assessing inheritance tax. Brief for appellant at 16. It argues that Garcia should have been classified as a "Class III beneficiary" and that he should pay the corresponding tax rate on Bort's estate pursuant to § 77-2006 (18 percent tax rate). Brief for appellant at 16.

In its brief, Douglas County addresses each of the seven factors set forth above from *In re Estate of Ackerman, supra*. While acknowledging that the relationship between Bort and Garcia was "undoubtedly loving and close," the county argues that it did not "rise to the level of an acknowledged parent-child relationship as contemplated" by § 77-2004. Brief for appellant at 26-27. The county argues that Garcia never resided with Bort and never went on vacations with him. And while Bort gave Garcia some money on occasion for birthdays, holidays, and graduation, he never provided financial assistance with Garcia's housing, clothing, food, college expenses, or other necessaries. The county also points out the lack of parental control and discipline exercised by Bort over Garcia, and the lack of "blood or marriage relation." *Id*. at 23. While it acknowledges that Bort provided advice and encouragement to Garcia, it contends that such a relationship is not different from a close family friendship. The county "does not dispute that Garcia and Bort spent more time together as Garcia got older and Bort became closer with Garcia's family." *Id*. at 24. And while it acknowledges that the "record provides evidence of time and affection shared

between Bort and the Orozco-Garcia family," it contends that this "by itself gives little weight to specifically establishing a parent-child relationship between Bort and Garcia." *Id*. While also acknowledging the two letters Bort sent to Garcia calling him "son" and signing one letter "Your Dad," the county nevertheless contends this is only "slight evidence of a parent-child relationship." *Id*. at 25.

Douglas County suggests that "[i]f any loving familial or quasi-familial relationship can be classified as a parent-child relationship for purposes of inheritance tax collection in the State of Nebraska, then there appears to be little purpose for differentiating between Class I, Class II, and Class III beneficiaries" as set forth in §§ 77-2004 through 77-2006 and in the factors enumerated in *In re Estate of Ackerman, supra*. Brief for appellant at 26. Douglas County asks this court to reverse the county court's decision for "clear error on the record." *Id*. at 27.

Ordinarily, on appeal of an inheritance tax determination, an appellate court reviews the case for error appearing on the record, and the factual findings necessary to determine whether the requisite acknowledged parent-child relationship of § 77-2004 exists should be reviewed for sufficient evidence and should not be disturbed on appeal unless clearly wrong. See *In re Estate of Hasterlik, supra*. However, as indicated earlier, our review of this appeal is limited to plain error. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *County of Lancaster v. County of Custer, supra*.

While we understand Douglas County's arguments that the factual record here had questionable sufficiency for a finding of in loco parentis, we cannot say that there is error plainly evident from the record that is of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. See *id.*

CONCLUSION

Finding no plain error in the county court's determination that a parent-child relationship existed under § 77-2004, we affirm the court's November 1, 2024, order.

AFFIRMED.