In re Estate of Dorothy B. Kite, deceased.
County of Lancaster, Nebraska, appellant, v.
Union Bank and Trust Company, Personal Representative
of the Estate of Dorothy B. Kite,
deceased, et al., appellees.

615 N.W.2d 481

Filed August 4, 2000.    No. S-98-496.

Gary E. Lacey, Lancaster County Attorney, and Michael E. Thew for appellant.

J.L. Spray and Jacqueline M. Schaneman, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellees.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## INTRODUCTION

Upon her death, Dorothy B. Kite (the testator) devised a substantial amount of her estate to her great-nephew, William R. Cordell, Jr. (Cordell), and Cordell's wife, Connie Cordell (Connie). Cordell commenced this action in Lancaster County Court to determine the inheritance tax due on the devise to Cordell and Connie. Although the testator and Cordell were great-aunt and great-nephew, and therefore potentially subject to taxation in accordance with Neb. Rev. Stat. § 77-2005 (Reissue 1996), Cordell sought to be taxed at the lower rate provided for in Neb. Rev. Stat. § 77-2004 (Reissue 1996), claiming that the testator for not less than 10 years before her death stood in an acknowledged relationship of a parent to Cordell. Finding that the evidence showed the necessary parental relationship existed between the testator and Cordell, the county court determined that both Cordell and Connie qualified for preferential tax treatment under § 77-2004. From this order, the County of Lancaster perfected the instant appeal.

## FACTS

At trial, the evidence established the following: Cordell is the natural son of William R. Cordell, Sr., and his wife, Bobette Wendelin Cordell. Bobette Wendelin Cordell was the testator's niece. William R. Cordell, Sr., was mentally and physically abusive toward his wife and his children. William R. Cordell, Sr., was also an adherent of Herbert W. Armstrong and his "World Wide Church of God." This religious belief governed their household and prohibited the celebration of traditional Christian and secular holidays. From a young age, Cordell spent the holidays with the testator and her husband, William Kite (collectively the Kites). The Kites had no children of their own.

Although Cordell lived with his parents in Kansas City during the school year, Cordell spent his childhood summers with the Kites in Lincoln. These visits began the summer after Cordell completed sixth grade and continued until his sophomore year of college. During these summers, Cordell enjoyed recreational activities, but also assumed responsibilities in the Kites' household, and was subject to discipline by the Kites. One of the summers during his high school years, the Kites enrolled Cordell in a military academy in Minnesota and paid for his tuition and expenses.

Cordell attended a junior college for 2 years in Kansas City, residing with his natural parents, then moved to Lincoln to attend Nebraska Wesleyan University. While Cordell was at college in Kansas City, the Kites did not pay for Cordell's tuition, but subsequently paid for his tuition at Nebraska Wesleyan University. During his year at Nebraska Wesleyan University, Cordell lived in a basement apartment in the Kites' house. There were five other apartments at this location. Cordell ate meals with the Kites and performed cleaning and other household tasks in exchange for free lodging and food. In addition, Cordell worked at several of the Kites' businesses and was paid as a regular employee.

The relationship between the Kites and Cordell continued as he reached adulthood, whereas Cordell's contact with his natural parents became more sporadic. William Kite died in August 1973, and Cordell did not inherit from his estate. As the testator aged, Cordell provided more advice and help to her on personal and financial matters. Cordell and Connie shared holidays with the testator, and the testator often introduced them to others as "the kids from Omaha" and "these are my kids from Omaha." The testator took an interest in the Cordells' children and treated them as her grandchildren.

During 1980, Cordell suffered from marital, financial, and significant alcohol problems. The testator encouraged him to receive treatment and provided financial help. In 1982, the testator gave Connie $10,000 for a downpayment on a house, but specifically provided that the house was to be titled in Connie's name until Connie felt that Cordell had made positive changes in his life.

The testator granted Connie her power of attorney for health care decisions, with Cordell as the substitute or successor attorney in fact. During her last illness, the testator was in frequent contact with the Cordells. The testator died on May 31, 1996, and in her will, she devised the residuary of her estate to her revocable trust agreement. The trust agreement provided that 50 percent of the residue of the trust estate be distributed to Cordell and Connie.

Pursuant to Neb. Rev. Stat. § 77-2018.07 (Reissue 1996), Cordell paid a tentative tax in the amount of $23,880.22. Cordell then petitioned the Lancaster County Court for a final determination of the tax due on his inheritance from the testator's estate, claiming that he had overpaid in the amount of $17,868.84.

Applying the factors delineated in *In re Estate of Ackerman*, 250 Neb. 665, 550 N.W.2d 678 (1996), the county court found that the testator stood in the acknowledged relationship of a parent to Cordell for a period of at least 10 years prior to her death. Specifically, the county court found that (1) the testator received Cordell into her home and treated him as a member of her family; (2) the testator assumed financial responsibility for him beyond occasional gifts and financial aid; (3) the testator exercised parental authority and discipline over him; (4) the blood relationship of great-aunt and great-nephew "enhanced their parent-child relationship"; (5) the testator provided advice and guidance to Cordell as a parent would to a child; (6) prior to her death and especially during the last 20 years of her life, the testator shared time and affection with Cordell and his family, including most holidays and vacations; (7) the testator's trust agreement was "a writing evincing [her] intent to act as a parent" to Cordell; and (8) the testator acknowledged her parent-child relationship to Cordell through her words and deeds, especially through statements made to her attorney. The county court found that § 77-2004 was the applicable statute with respect to Cordell and that Connie, as his spouse, qualified for the exemption and tax treatment under § 77-2004. The county court, therefore, ordered the treasurer of Lancaster County to refund the overpayment of $17,868.84 to the personal representative of the testator's estate. The County of Lancaster (hereinafter the appellant) appeals the county court's order, in accordance with Neb.

Rev. Stat. § 77-2023 (Reissue 1996), alleging that the court erred in applying § 77-2004, rather than § 77-2005. We moved this case to our docket pursuant to our authority to regulate the caseloads of the appellate courts of this state. Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## ASSIGNMENTS OF ERROR

The appellant asserts that the county court erred in (1) failing to apply the provisions of § 77-2004 strictly, (2) finding that the testator received Cordell into her home and treated him as a member of her family, (3) finding that the testator assumed financial responsibility for Cordell beyond occasional gifts and financial aid, (4) finding that the testator exercised parental authority and discipline over Cordell, (5) finding that the blood relationship between the testator and Cordell "enhanced their parent-child relationship," (6) finding that the testator's amended and restated trust agreement constituted a writing evincing her intent to act as a parent to Cordell, (7) finding that the testator acknowledged a parent-child relationship between herself and Cordell by her words and deeds, and (8) finding that Cordell adduced sufficient evidence to sustain his burden of proving that the testator stood in the acknowledged relationship of a parent to him for purposes of § 77-2004.

## STANDARD OF REVIEW

The scope of review in an appeal of an inheritance tax determination is review for error appearing on the record. See *In re Estate of Ackerman*, 250 Neb. 665, 550 N.W.2d 678 (1996). Factual findings necessary in determining if the requisite acknowledged parent-child relationship of § 77-2004 exists should be reviewed for sufficient evidence and should not be disturbed on appeal unless clearly wrong. *Id.*

## ANALYSIS

Two statutes are relevant to this appeal. Section 77-2004 provides, in pertinent part:

> In the case of . . . any person to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent, or the spouse or surviving spouse of any such persons, the rate of tax shall be *one*

*percent* of the clear market value of the property in excess of ten thousand dollars received by each person.

(Emphasis supplied.)

In contrast, § 77-2005 provides:

In the case of an uncle, aunt, niece, or nephew related to the deceased by blood or legal adoption, or other lineal descendant of the same, or the spouse or surviving spouse of any of such persons, the rate of tax shall be *six percent* of the clear market value of the property received by each person in excess of two thousand dollars and not exceeding sixty thousand dollars; and on all the excess over sixty thousand dollars, the rate of tax shall be *nine percent.*

(Emphasis supplied.)

The question we must answer in this appeal, keeping in mind that the trial judge observed and heard the witnesses and accepted one version of the facts rather than another, see *Allied Mut. Ins. Co. v. Midplains Waste Mgmt.*, 259 Neb. 808, 612 N.W.2d 488 (2000), is whether the county court erred in determining that the testator, for not less than 10 years prior to her death, stood in the acknowledged relationship of a parent to Cordell. We do note that statutes exempting property from inheritance tax should be strictly construed, and the burden is on the taxpayer to show that he or she clearly falls within the language of the statute. *In re Estate of Ackerman, supra.* Hence, Cordell has the burden to show that his relationship with the testator warrants application of § 77-2004.

In order to determine whether the evidence establishes such a parental relationship, it is necessary to analyze the scope of the statutory language, "acknowledged relation[ship] of a parent." See § 77-2004. This language has been held to extend beyond blood relatives to persons standing "in loco parentis" with the taxpayer. *In re Estate of Ackerman*, 250 Neb. 665, 550 N.W.2d 678 (1996), citing *In re Estate of Dowell*, 149 Neb. 599, 31 N.W.2d 745 (1948). In addition, residency in the testator's home is not required to be a person to whom the testator for not less than 10 years prior to death stood in the acknowledged relationship of a parent, and, in fact, in *In re Estate of Ackerman*, we noted that an express requirement to this effect has been eliminated from the statute. We also noted that " 'although a natural

parent-child relationship may exist elsewhere, if the parties regard each other in all of the usual incidents and relationships of family life as parent and child, the benefits' of the inheritance tax statute" should flow. *Id.* at 672, 550 N.W.2d at 683, citing *Estate of Larson*, 106 Cal. App. 3d 560, 166 Cal. Rptr. 868 (1980). In determining whether a person stands in loco parentis to another within the context of § 77-2004, we also stated that a person may stand in loco parentis despite other sources of support for the child, and we noted that our determination of the nature of the relationship between the testator and the taxpayer is not limited to an examination of the childhood years of the taxpayer. *In re Estate of Ackerman, supra.*

After examining specific criteria that other jurisdictions utilized in determining when an "acknowledged relation[ship] of a parent" exists, and considering *In re Estate of Quinn*, 1 Neb. App. 1025, 510 N.W.2d 488 (1993), we opined in *In re Estate of Ackerman*, 250 Neb. at 673-74, 550 N.W.2d at 684:

> The trial court should consider all pertinent factors in arriving at [the determination that an "acknowledged relationship of a parent" exists]. Any list of suggested criteria is not meant to be exhaustive, nor will every factor necessarily be present in each case; however, we conclude that the following factors serve as appropriate guideposts to the trial court in making a determination of an acknowledged relation[ship] of a parent under § 77-2004: (1) reception of the child into the home and treatment of the child as a member of the family, (2) assumption of the responsibility for support beyond occasional gifts and financial aid, (3) exercise of parental authority and discipline, (4) relationship by blood or marriage, (5) advice and guidance to the child, (6) sharing of time and affection, and (7) existence of written documentation evincing the decedent's intent to act as parent.

Applying the criteria set forth in *In re Estate of Ackerman* (*Ackerman* factors) to the instant case, we conclude, for the reasons that follow, that the county court did not err in applying § 77-2004. There is sufficient evidence in the record to support the findings that the testator stood in an acknowledged relationship of a parent to Cordell for not less than 10 years prior to her

death. In our analysis, it is important to note that each *Ackerman* factor is not required to be present in order to find the requisite parental relationship, nor is it necessary that the appellate court would make the same factual determination for each *Ackerman* factor, see *In re Estate of Ackerman, supra*; rather, our review is for error appearing on the record, considering all of the circumstances of a particular case.

With that background, we turn our attention to the circumstances of the instant case, utilizing the applicable *Ackerman* factors as guideposts in our review. First, while it is true that Cordell did not reside at the Kites' home on a full-time basis, the testimony of Cordell and witnesses on his behalf clearly establishes that he was treated as a member of the Kites' family. Since childhood, Cordell spent most holidays and vacations with the Kites. He lived with the Kites for 1 year while attending Nebraska Wesleyan University, frequently sharing meals with them. The Kites treated Cordell as a member of the family, teaching him recreational activities, while also imposing responsibilities and discipline upon him. Both Cordell and the testator's attorney testified that the testator referred to Cordell and Connie as "my kids."

The appellant points to the temporary nature of Cordell's stays with the Kites and also notes that Cordell did not sever his ties with his natural parents. Although true, the evidence shows that the relationship between the Kites and Cordell grew as Cordell reached adulthood, whereas Cordell has had only sporadic contact with his natural parents during his adulthood. Moreover, Cordell's stays with the Kites could not fairly be deemed temporary in nature. In addition to the year that Cordell lived with the Kites while he attended Nebraska Wesleyan University, Cordell spent extended periods of time with the Kites, and the evidence reveals that he spent most of his holidays and vacations with them.

In *In re Estate of Ackerman*, 250 Neb. 665, 550 N.W.2d 678 (1996), for example, the claimant had not formally resided with the testator, but had spent many holidays and vacations with the testator's family. Despite this lack of formal residency, we concluded that the claimant had been received into the home, noting that the claimant "spent the vast majority of her time with

the Ackermans and was given responsibility and advice as would have been given a member of the family." *Id.* at 674, 550 N.W.2d at 684. Based on the testimony in the instant case, it is clear that Cordell was welcomed into the Kites' home both as a child and as an adult and that the Kites treated him as a member of their family in virtually the same way that the claimant was welcomed into the Ackerman home. See *id.*

Second, the record establishes that the Kites assumed responsibility for Cordell's support beyond occasional gifts and financial aid. The testimony at trial revealed that the Kites paid for Cordell's tuition at the military academy, as a youth, and also his tuition at Nebraska Wesleyan University, as a young man. While attending Nebraska Wesleyan University, Cordell lived with the Kites. The appellant argues that this situation equates to a quid pro quo relationship because Cordell was required to perform some household tasks in exchange for free lodging and meals. Cordell's chores included lawn mowing, gutter cleaning, leaf raking, and painting, and at the Kites' businesses, he was the groundskeeper. The same "quid pro quo" argument was made in *In re Estate of Ackerman*, 250 Neb. at 675, 550 N.W.2d at 685, and we rejected it under similar facts, stating:

> [A]lthough [the claimant] worked in the Ackermans' shops and at their home on a regular basis, there was no express or written agreement of support in exchange for services, and the funds and amenities provided to [the claimant] by the Ackermans would seem to far exceed what she would have made as a "salary" for such work. Therefore, the district court was correct in its determination that the county court erred when it concluded that the relationship between Rollo Ackerman and [the claimant] amounted to nothing more than a "quid pro quo" relationship.

Suffice it to say, in the instant case, that the tuition at the military academy and at Nebraska Wesleyan University far exceeded any quid pro quo that may have existed for Cordell's free lodging and meals for 1 year. In addition, in 1982, the testator gave Connie $10,000 for a downpayment on a house, subject only to the provision that the house be titled in Connie's name until Connie felt that Cordell had made positive changes in his recovery from alcoholism at that time in his life. Thus, sufficient evi-

dence supported the county court's determination that the testator assumed responsibility for Cordell's support beyond occasional gifts and financial aid.

It is further evident from the record that the Kites exercised parental authority and discipline over Cordell, and provided advice and guidance to Cordell at crucial times in his life. When appropriate in his childhood, the Kites grounded and otherwise disciplined Cordell. During adolescence, when Cordell was struggling in school, the testator decided that he needed to spend a summer at the military academy. The Kites took away privileges when Cordell misbehaved.

The appellant attempts to distinguish *In re Estate of Ackerman*, 250 Neb. 665, 550 N.W.2d 678 (1996), from the case at bar because in that case, the testimony established that the testator insisted on meeting the claimant's boyfriends, monitored her hours, and generally told her what she could and could not do. Although the record in this case does not reveal that the Kites set a curfew or insisted on meeting Cordell's friends, there is ample evidence that during his childhood summers, they told him what he could do or not do by taking away privileges and otherwise disciplining him. As in *In re Estate of Ackerman*, we focus on whether a parental type of discipline existed, not on varying levels of discipline that a parent may be expected to exercise.

The appellant does not adamantly dispute the fact that the testator provided advice and guidance to Cordell, but asserts that "neither the type nor the extent of such advice and guidance is necessarily exclusive to [a] parent-child relationship." Brief for appellant at 23. The appellant's argument in this regard is unpersuasive. The testator provided crucial advice and guidance to both Cordell and Connie at the most difficult points of their lives. When the Cordells were experiencing marital problems, and Cordell was experiencing alcohol problems, the testator provided tough but loving advice to Cordell and needed financial support to both Cordell and Connie.

The appellant makes the same type of exclusivity argument with reference to the factor of sharing time and affection, and we similarly reject it. The record is replete with evidence that Cordell spent significant amounts of time with the testator,

including childhood summers, holidays, vacations, living in her house while attending Nebraska Wesleyan University, and significantly caring for her during the last 20 years of her life. We cannot conclude that the county court was clearly wrong in finding that Cordell and the testator shared substantial time and affection.

The remaining factors in determining a relationship by blood or marriage and the existence of written documentation evincing the testator's intent to act as a parent are not significant in our review of this case. As previously noted, the testator and Cordell were great-aunt and great-nephew, respectively. The appellant asserts that the existence of this blood relationship is inimical to Cordell's assertion that the testator stood in the acknowledged relationship of a parent to him. While we have, in fact, determined in other cases regarding the application of § 77-2004 that blood relatives could stand in an acknowledged parent-child relationship, see *In re Estate of Stanton*, 245 Neb. 942, 516 N.W.2d 586 (1994) (great-uncle and great-nephew), and *In re Estate of Dowell*, 149 Neb. 599, 31 N.W.2d 745 (1948) (aunt and niece), the relationship by blood or marriage is simply not a substantial factor one way or the other under the circumstances of this case. Likewise, there is no written documentation expressly referring to Cordell "as a son" or "like a son" of the testator, although such an explicit reference is not required. Nonetheless, we do not agree with the county court's finding that the trust agreement, with its substantial devise to Cordell and Connie, necessarily evinces a parental relationship. We do not find this factor to be present one way or the other in this case.

The appellant finally assigns as error the county court's finding that the testator acknowledged a parent-child relationship between herself and Cordell by her words and deeds and its finding that Cordell adduced sufficient evidence to sustain his burden of proving that the testator stood in the acknowledged relationship of a parent to him for purposes of § 77-2004. We do not agree. There is ample evidence in the record that the testator often acknowledged this relationship. Both Cordell and the testator's attorney testified that she frequently referred to Cordell and Connie as "my kids from Omaha." After considering all of

the circumstances in the instant case, including the applicable *Ackerman* factors, we conclude that the county court did not err in determining that Cordell had met his burden of proof and in applying § 77-2004 in the instant case.

## CONCLUSION

Having considered all of the appellant's assignments of error and finding them to be without merit, we affirm the judgment of the county court.

AFFIRMED.

HENDRY, C.J., not participating.