IN RE ESTATE OF THOMAS JOSEPH MALLOY, DECEASED.
STATE OF NEBRASKA, APPELLEE, V.
THOMAS A. WELSH, APPELLANT.
736 N.W.2d 399

Filed July 17, 2007.　No. A-06-178.

James D. Gotschall and Andrew J. Hoffman, of Strope, Krotter & Gotschall, P.C., for appellant.

Thomas P. Herzog, Holt County Attorney, for appellee.

INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.

SIEVERS, Judge.

Thomas Joseph Malloy died on June 19, 2003, and he devised a substantial amount of his estate to his nephew, Thomas A. Welsh. As part of an amended petition for determination of inheritance tax, although Welsh would ordinarily be subject to taxation in accordance with Neb. Rev. Stat. § 77-2005 (Reissue 2003), Welsh sought to be taxed at the lower rate provided for in Neb. Rev. Stat. § 77-2004 (Reissue 2003), claiming that Malloy, for not less than 10 years before his death, stood in an acknowledged relationship of a parent to Welsh. Finding that the evidence was insufficient to show the necessary parental relationship existed between Malloy and Welsh, the county court determined that Welsh did not qualify for preferential tax treatment under § 77-2004. From this order, Welsh perfected the instant appeal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

When Malloy died, he owned 1,280 acres of real estate. Malloy bequeathed Welsh 320 acres of land outright and gave him an option to purchase 640 additional acres. In addition, Welsh received a per stirpes share of the residuary estate. On August 31, 2004, Welsh filed a petition for determination of

inheritance tax as copersonal representative along with one other copersonal representative. On September 28, the county court assessed inheritance tax against the named parties in its order, including Welsh. The value of Welsh's gross estate from Malloy totaled $496,232.91. The court taxed Welsh at the rate for an immediate relative of the decedent under § 77-2004. The inheritance tax assessed against Welsh was $4,009.17.

On the county court's own motion, the court scheduled a hearing to redetermine the inheritance tax. On December 13, 2005, Welsh filed an amended petition for determination of inheritance tax alleging that Welsh qualified as a "Class I" heir, falling under the provisions of § 77-2004, because Malloy, for 10 years prior to his death, stood in an acknowledged relationship of a parent to Welsh. The amended petition further provided that Welsh's gross estate was then valued at $570,307.56.

The hearing was held on December 13, 2005. The court received into evidence seven exhibits, including the first inheritance tax worksheet signed by the State, which allowed Welsh to be taxed as a Class I heir, under § 77-2004, and numerous affidavits attesting to the close relationship between Malloy and Welsh. The parties entered a stipulation that prior to signing the inheritance tax worksheet that allowed Welsh to be taxed as a Class I heir, under § 77-2004, the State was aware that Welsh was being treated as a Class I heir. As part of the stipulation, the State also admitted that Welsh had provided the State with the above-mentioned affidavits attesting to the existence of Malloy and Welsh's close relationship prior to the State's signing the first inheritance tax worksheet. The State admitted to the court that it made a mistake when it agreed to the initial inheritance tax worksheet by signing it.

Welsh's affidavit stated that his mother was Malloy's sister and that he was one of the copersonal representatives of Malloy's estate. Welsh explained that when his father died in 1966, Welsh was 26 years old, and that after Welsh's father's death, Malloy took Welsh "under his wing and stood in the shoes of [his] father for the remainder of his life." According to Welsh, since 1945, he has lived 1.5 miles from Malloy's home, and when he was young and the road conditions were poor, he stayed with Malloy during the school year. Welsh further

explained that since 1945, Malloy cut his hair, and that since 1952, he cut Malloy's hair. Even though Malloy had nine nieces and nephews, when Malloy died, he owned 1,280 acres and bequeathed 320 acres outright to Welsh and gave him an option to purchase 640 additional acres. Malloy also left Welsh's son an option to purchase the final 320 acres and "wanted him to have an option to purchase his 'home place.'" Welsh also stated that in 1998, Malloy appointed him as his attorney in fact, and that Welsh acted as Malloy's durable power of attorney and health care power of attorney until the time of his death on June 19, 2003. Welsh stated that Malloy gave him advice on ranching operations, on how to deal with "certain family members" and his personal life, and on which bulls to buy. According to Welsh, Malloy told him how to raise his children. Welsh stated that Malloy gave him financial support by assisting him with purchasing equipment and real estate. In his affidavit, Welsh gave one example from 1974 when Malloy and Welsh "drove all over the state looking for a stackmover" and they "bought one in Plainview." According to Welsh, he saw Malloy 6 or 7 days a week and he and Malloy spent 3 to 4 days a week together working until Malloy moved to a nursing home in 2002. Welsh stated that Malloy spent his holidays with Welsh and that Malloy spent his recreational time with Welsh fishing and brewing beer. Welsh drove Malloy to church on Sundays as well as to all of his doctor appointments. Malloy had a place of honor at Welsh's children's weddings. Welsh stated that during the last 20 years of Malloy's life, Welsh did nearly all of Malloy's chores and took care of Malloy's ranching operations without being paid.

In his affidavit, Dr. Robert Randall, Malloy's physician, friend, and neighbor, stated that Malloy "depended upon . . . Welsh and relied upon him like a son" and that Malloy treated and acknowledged Welsh "like a son." According to Dr. Randall, while Malloy "had no biological sons, . . . Welsh was treated by . . . Malloy as the son he never had." Dr. Randall is not related to Malloy or Welsh.

Dale Mlinar stated in his affidavit that he was Malloy's neighbor and close friend. According to Mlinar, he spoke with Malloy at least once a week from 1937 until the time when

Malloy moved to the nursing home. Mlinar stated that Malloy acknowledged Welsh like a son, praised Welsh like a son, and for 10 years prior to his death, treated Welsh like a son. Mlinar stated that "Malloy's verbal acknowledgments of . . . Welsh being like a son were carried out by his actions." Mlinar is not related to Malloy or Welsh.

According to her affidavit, Juli McCumber lived near Malloy and had known Malloy for 10 to 15 years. McCumber stated that whenever Malloy had a problem, he relied upon Welsh for help. According to McCumber, "Malloy, by his words and actions, acknowledged . . . Welsh like a son . . . ." McCumber is not related to Malloy or Welsh.

Applying the factors of *In re Estate of Ackerman*, 250 Neb. 665, 550 N.W.2d 678 (1996), the court found that for purposes of computing inheritance taxes, the evidence presented failed to show that Malloy for not less than 10 years prior to his death stood in the acknowledged relationship of a parent to Welsh, and ordered that the property passing to Welsh from Malloy be taxed pursuant to § 77-2005. Welsh now appeals.

## ASSIGNMENT OF ERROR

Welsh asserts that the county court erred in finding that pursuant to § 77-2004, the evidence did not establish that he is a person to whom the deceased for not less than 10 years prior to death stood in an acknowledged relationship of a parent.

## STANDARD OF REVIEW

The scope of review in an appeal of an inheritance tax determination is review for error appearing on the record. See *In re Estate of Ackerman, supra.* Factual findings necessary in determining if the requisite acknowledged parent-child relationship of § 77-2004 exists should be reviewed for sufficient evidence and should not be disturbed on appeal unless clearly wrong. *In re Estate of Ackerman, supra.*

## ANALYSIS

Welsh argues that "[w]hen comparing the facts of this case to the predecessor cases, it[']s hard to find any meaningful distinctions." Brief for appellant at 30. Welsh requests that this court reverse the county court's denial of the amended petition

for determination of inheritance tax and allow him to be taxed at the lesser rate prescribed by § 77-2004.

Two statutes are relevant to this appeal. Section 77-2004 provides, in pertinent part:

> In the case of . . . any person to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent, or the spouse or surviving spouse of any such persons, the rate of tax shall be one percent of the clear market value of the property in excess of ten thousand dollars received by each person.

In contrast to the beneficial tax rate of § 77-2004, § 77-2005 provides:

> In the case of an uncle, aunt, niece, or nephew related to the deceased by blood or legal adoption, or other lineal descendant of the same, or the spouse or surviving spouse of any of such persons, the rate of tax shall be six percent of the clear market value of the property received by each person in excess of two thousand dollars and not exceeding sixty thousand dollars; and on all the excess over sixty thousand dollars, the rate of tax shall be nine percent.

The question we must answer in this appeal, keeping in mind that the trial judge observed and heard the witnesses and accepted one version of the facts rather than another, see *Allied Mut. Ins. Co. v. Midplains Waste Mgmt.*, 259 Neb. 808, 612 N.W.2d 488 (2000), is whether the county court was clearly wrong in determining that Welsh failed to prove that the testator, Malloy, for not less than 10 years prior to his death, stood in the acknowledged relationship of a parent to Welsh. We note that statutes exempting property from inheritance tax should be strictly construed, and the burden is on the taxpayer to show that he or she clearly falls within the language of the statute. *In re Estate of Kite*, 260 Neb. 135, 615 N.W.2d 481 (2000). See, also, *In re Estate of Ackerman*, 250 Neb. 665, 550 N.W.2d 678 (1996). Accordingly, Welsh has the burden to show that his relationship with Malloy warrants application of § 77-2004.

The scope of the statutory language, "'acknowledged relation[ship] of a parent,'" extends beyond blood relatives to persons standing in loco parentis with the taxpayer. See *In re Estate of Kite*, 260 Neb. at 140, 615 N.W.2d at 485. See, also,

*In re Estate of Ackerman, supra,* citing *In re Estate of Dowell,* 149 Neb. 599, 31 N.W.2d 745 (1948). Additionally, even though a natural parent-child relationship may exist elsewhere, if the parties regard each other in all of the usual incidents and relationships of family life as parent and child, the benefits of § 77-2004 should be allowed. See *In re Estate of Ackerman, supra.* In determining whether a person stands in loco parentis to another within the context of § 77-2004, a person may stand in loco parentis despite other sources of support for the child. *In re Estate of Ackerman, supra.* For purposes of § 77-2004, our determination of the nature of the relationship between the testator and the taxpayer is not limited to an examination of the childhood years of the taxpayer. See *In re Estate of Ackerman, supra.*

As in this case, the factors that a trial court should consider in arriving at the determination that an acknowledged relationship of a parent does or does not exist include, but are not limited to, the following guideposts:

> (1) reception of the child into the home and treatment of the child as a member of the family, (2) assumption of the responsibility for support beyond occasional gifts and financial aid, (3) exercise of parental authority and discipline, (4) relationship by blood or marriage, (5) advice and guidance to the child, (6) sharing of time and affection, and (7) existence of written documentation evincing the decedent's intent to act as parent.

*In re Estate of Ackerman,* 250 Neb. at 674, 550 N.W.2d at 684.

Applying the criteria set forth in *In re Estate of Ackerman, supra,* to the instant case, we conclude, for the reasons that follow, that the county court did not err in denying Welsh the status he seeks under § 77-2004. We note that our review is for error appearing on the record, considering all of the circumstances of a particular case, and we do not disturb the lower court's factual findings unless they are clearly wrong.

Regarding the first and third guideposts, the county court found and the record demonstrated that when Welsh was a child and the roads were bad, he and his sister would stay at Malloy's home and Malloy provided subsistence for Welsh and his sister when they stayed at his house. The county court further found

that the evidence demonstrated that after Welsh's biological father passed away when Welsh was 26 years old, Malloy would tell Welsh if he disapproved of Welsh's actions.

With respect to the second and fourth guideposts, the county court found and the record established that Malloy gave Welsh moral support and unspecified financial support as well as advice on equipment purchases. In Welsh's affidavit, the only specific reference to how Malloy financially supported Welsh was when Malloy assisted Welsh in purchasing a stackmover in 1974. The record established that Welsh had a relationship with Malloy by blood, because Welsh was Malloy's nephew.

The record contained evidence of the fifth guidepost, giving advice and guidance, in that Malloy gave Welsh advice on his ranching operations, including choosing Welsh's bulls for him and choosing which equipment to purchase. Between 1962 and 2003, Welsh saw Malloy 6 or 7 days a week, and between 1962 and 1992, Malloy and Welsh worked 3 to 4 days a week side by side together. Malloy also guided Welsh on how to maintain his biological father's ranching operation. The county court further found the evidence demonstrated that Malloy gave advice to Welsh about certain family members and about how to conduct his personal life and that Malloy gave Welsh advice on how to raise his children.

Lastly, regarding the sixth and seventh guideposts, the county court noted and the record is replete with evidence of the close relationship between Malloy and Welsh, and it is obvious that they shared time and affection with one another. The county court found that Malloy and Welsh fished together and brewed beer together. In addition to the above findings, the court also found that Malloy and Welsh spent the holidays together. Welsh also drove Malloy to church every Sunday and to his doctor's appointments as well as to the hospital when Malloy needed medical attention. Malloy sat at a place of honor with Welsh's mother at Welsh's children's weddings. From 1945 until 2003, Malloy cut Welsh's hair, and since 1952, Welsh cut Malloy's hair. Welsh acted as Malloy's attorney in fact under a durable power of attorney for approximately 5 years at the end of Malloy's life. The county court noted and the record reflects the following with respect to Malloy and Welsh's relationship:

Mlinar stated that Malloy "'acknowledged (Welsh) like a son'" and that Malloy's "'verbal acknowledgments of (Welsh) being like a son were carried out by his actions'"; Dr. Randall stated that Malloy depended on Welsh like a son and treated Welsh like "the son he never had"; and McCumber stated that Malloy "relied upon . . . Welsh for everything" and that "by his words and actions," Malloy acknowledged Welsh like a son. The court found and the record provides that the only written document evincing Malloy's intent to act as a parent was Malloy's will, the provisions of which support an inference that Malloy gave Welsh and Welsh's son deferential treatment in his will.

In reaching its decision that Malloy did not stand in the acknowledged relationship of a parent to Welsh, the county court determined that there were no actual quotations from Malloy in which he directly acknowledged his relationship with Welsh as anything more than a close uncle-nephew relationship, and Malloy's will did not acknowledge the requisite relationship. Regarding the will and what inferences could be drawn from the large bequest given to Welsh, the court wrote:

> The bequest is a two edged sword. On the one hand, Welsh is given some property outright. On the other hand, he is only given an option to buy other property. Since the will is silent, the court cannot speculate or determine the intentions of the decedent as to whether he meant this as saying he was giving much of his property to Welsh because he viewed him as his son or as a dutiful nephew who had for years helped maintain the land.

The court found that as a child, Welsh went to his biological parents' home for permanency; that the financial aid given to Welsh by Malloy was not "out of the ordinary" for family members in rural society; that the issue of guidance and discipline was not really an issue in the case because the primary relationship was an adult relationship; and that "[t]he evidence of Malloy advising and counseling Welsh is insufficient to show the type of parent/child relationship required by the statute." The court concluded that while there "may be some evidence under each category" of the guideposts set forth in *In re Estate of Ackerman*, 250 Neb. 665, 550 N.W.2d 678 (1996), this "does not prove that the requisite acknowledgment existed." The court

explained, "It is the weight of the evidence in terms of quality not quantity that determines an issue."

Clearly, Malloy and Welsh shared a close relationship, one that is not uncommon among families who farm and ranch in close proximity to one another. Welsh took over his father's ranching operation, which was quite near to Malloy's, when he was 26 years old after his father's death. Thus, the time he and Malloy spent together appears to be a rather natural consequence of such fact and the fact that they were related. The care that Welsh took of Malloy as he aged also seems a natural consequence of such relationship. But, the record lacks evidence of Malloy's written intent to act as Welsh's father. While not holding or suggesting that such written evidence of intent is mandatory, without such we cannot say that the county court erred in finding that a father-son relationship had not been proved from this record. Therefore, we find that there was no error appearing on the record regarding the county court's inheritance tax determination and that the county court was not clearly wrong in its factual findings. We affirm the county court's order finding that the evidence failed to show that Malloy for not less than 10 years prior to his death stood in the acknowledged relationship of a parent to Welsh.

AFFIRMED.