IN RE ESTATE OF LEO STRAKA, DECEASED.
STATE OF NEBRASKA, APPELLEE, V. MARY ANN KENNEDY
AND PATRICK KENNEDY, APPELLANTS.

736 N.W.2d 406

Filed July 17, 2007.    No. A-06-1047.

Jason D. Mielak, of Fehringer, Mielak & Fehringer, P.C., L.L.O., for appellants.

Thomas P. Herzog, Holt County Attorney, for appellee.

INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.

INBODY, Chief Judge.

## INTRODUCTION

Mary Ann Kennedy and Patrick Kennedy appeal from the judgment of the county court for Holt County, Nebraska. The county court found that Mary Ann failed to provide evidence showing the necessary parental relationship existed between testator Leo Straka and Mary Ann and determined that Mary Ann did not qualify for preferential tax treatment under Neb. Rev. Stat. § 77-2004 (Reissue 2003). For the reasons set forth herein, we affirm the judgment of the county court.

## STATEMENT OF FACTS

On May 30, 2006, Mary Ann and Patrick, as successor co-trustees of the Leo Straka Trust, filed a petition for determination of inheritance tax. In the petition, Mary Ann and Patrick asserted that they had calculated tentative inheritance tax based on Mary Ann's classification as a "Class 2" beneficiary, "on the condition the Order may be amended, altered or modified by subsequent Order of the Court if it is determined by the Court that Mary Ann . . . qualifies as a Class 1 beneficiary as provided in . . . §77-2004 due to her 'in loco parentis' relationship with [Leo]." Thus, Mary Ann and Patrick requested a hearing to determine whether Mary Ann qualified as a "Class 1" beneficiary, i.e., one as provided for by § 77-2004.

A hearing was held on July 25, 2006, to determine whether Mary Ann qualified as a beneficiary under § 77-2004 due to her alleged "in loco parentis" relationship with Leo. Dr. Robert Randall, a physician practicing in Atkinson, Nebraska, testified on behalf of Mary Ann and Patrick. Dr. Randall testified that he had known Leo for over 20 years and had been his physician. Dr. Randall stated that Mary Ann usually brought Leo to appointments and that she "sometimes [was] actually . . . present at the visits."

Dr. Randall described his observations of the interactions between Mary Ann and Leo:

> Well, she was always very caring of him and concerned and actually took responsibility for every single bit of the transport of him for his visits. And then even over at the nursing home, making arrangements for everything there.

She would be over at the nursing home when I went over there. She was always the one that was facilitating all the trips to Norfolk or wherever they had to go for specialty treatments. So she . . . was just the general caretaker of [Leo].

Dr. Randall stated that when Leo lived in Atkinson, he lived with Bill Straka, his brother, and Gertrude Straka, his sister, who is Mary Ann's mother; he stated that he observed Mary Ann's vehicle at their home almost daily. Dr. Randall testified that Leo relied on Mary Ann:

Well, she was the one that had to bring him for his treatments or took care of everything related to the finances at the [nursing home]. She took care of all that. And I think that she was even over helping at the house out in the lawn as he got older. . . . [S]he would be even helping with that because he just got frail and very — just couldn't do it. So those are the general types of things.

Dr. Randall testified that he believed the relationship between Leo and Mary Ann "seemed very much like a father/daughter relationship, you know, like other people would take care of their parents just as she was taking care of him." He stated, "It would seem to me that [Leo] would . . . have seen [Mary Ann] as a daughter, having lived there all the time. I never heard [Leo] call [Mary Ann] his daughter but certainly my feeling would be that he saw her as a daughter."

On cross-examination, Dr. Randall again noted that he never heard Leo refer to Mary Ann as his daughter, and he added that Mary Ann did not call Leo "Dad." On redirect examination, however, Dr. Randall said that the relationship between Mary Ann and Leo was "much more like a father and a daughter" than like an uncle and a niece.

Mary Ann testified in her own behalf. She testified that Leo was her uncle and that she had never "known or had a relationship with [her] biological father." She said that Leo neither married nor had biological children. As she was growing up, she and Leo lived in the same house. She described her relationship to Leo as she was growing up:

As a child my first memory of Leo was sitting on my grandfather's lap and — and having Grandpa read letters

from Leo and I remember that every letter he asked about me and — and referred to me as how's the kid or how's little Mary [Ann]. I remember his times being home on leave from the service and how special those times were. Then when he came home from the service he was injured — his back was — [h]e had a bad back for awhile [sic]. I recall just taking care of him already then. And then he became self-sufficient and . . . we worked on the farm. I — I followed him daily. I spent more time with - with Leo. When he plowed a field with horses, I ran behind and would pick up the worms and then we'd get to go fishing together. When he cultivated corn the same thing. I carried water jugs out to him. He'd help me to drive the team of horses home at noon when we'd — he would come home for lunch. He taught me everything I knew about the farm. And as I got a little bit older I — I participated in — in doing farm chores. We milked 30 to 40 cows. I did that night and morning with him. My mother[, Gertrude,] did that also. We — [e]very time they went to town for anything, I was with 'em. Usually my mom wasn't going, it was always me with Leo. He was doing all the driving because Leo — or Uncle Bill didn't see well enough to drive. He had had an accident and so his vision was kind of limited and — [b]ut I was always with them.

Mary Ann stated that as she grew up, Leo would discipline her, and that she "always had great respect for anything that he said." Leo provided her with a vehicle after she graduated from high school. When Leo did discipline Mary Ann, he did not ask Mary Ann's mother, Gertrude, first. Mary Ann also said that on one occasion when she was 9 or 10 years old, she and Leo took a vacation to Omaha alone together. She stated that she had chores and worked directly with Leo and that he taught her how to do the chores. Mary Ann testified that as she grew up, "the expenses for [her] clothing, food, utilities and shelter [were] a shared expense between" Leo, Gertrude, and one of her other uncles, Bill. Mary Ann testified that while she was still a child, when she asked Gertrude if she could do something, Gertrude would say, "'Well, I don't know, if Leo thinks that's okay. I suppose if it's okay with Leo.'"

Mary Ann testified that she eventually got married and moved to Lincoln, but that Leo "advised [her] with regard to living arrangements in Lincoln." She lived in Lincoln for approximately 23 years, and she operated a home daycare. Mary Ann said that while she lived in Lincoln, she would visit Leo and Gertrude "[u]sually once a month and always for holidays." In 1983, Mary Ann moved back to Atkinson. Leo built a house in town, and Mary Ann and her family moved into the house that Leo, Gertrude, and Bill had lived in prior to building the new house. Mary Ann testified that after she moved back to Atkinson, she saw Leo nearly every day. She stated that she "was helping [Leo and Gertrude] with laundry, helping 'em keep the house clean, doing meals, taking — sometimes taking meals into [sic] them, helping them grocery shop."

Mary Ann testified that Leo entered a nursing home in October 2003 and that she "was there for every meal and almost throughout the day because he had a couple of really, really bad weeks and he did not want [her] to leave." She stated, "I was with him constantly." She was also helping Gertrude, and she "would have to go stay with her at night and keep her kind of calm." This lasted for approximately 1 month, until Gertrude went to live at the nursing home also. Mary Ann handled all of Leo's financial affairs, beginning 2 to 3 years before he entered the nursing home and lasting until his death. She also handled his health care decisions when he entered the nursing home, as she had a durable power of attorney for both financial and health care decisions. She made all of Leo's medical appointments, and she usually attended the appointments with Leo. She stated that she "consider[ed] Leo . . . to be like a father" to her and that it was her "perception that Leo . . . considered [her] to be like a daughter to him."

On cross-examination, Mary Ann conceded that she told Fr. LuVerne Steffes that she considered several men father figures, stating, "Not as much as Leo, not as much as Bill, but there were two other uncles, two of [Gertrude's] brothers." She stated that Leo made a will in 1991, after Bill had died in 1989, and that the will "left most everything" to Patrick, who is her son, and her. When Bill died, all of the ranch land and farming and ranching equipment went to Leo. Mary Ann then testified that

"if Bill had been the one that lived the longest instead of Leo [she would] have claimed that [she] had a father[-daughter] relationship with Bill."

Scott Kaup next testified on the behalf of Mary Ann and Patrick. Kaup testified that he owned a business providing "investment adviser service and investment sales and service, income tax preparation and planning, and all lines of insurance." Kaup said that Leo was one of his clients for approximately 15 years. Kaup was asked how often Mary Ann accompanied Leo to business appointments, and Kaup replied:

> Early on Leo did most of his business by himself. I'd say [probably] the first five years. Starting after that, maybe in the last 10, Mary Ann used to accompany him on the meetings, and in the last five, six years, maybe a little longer, she was there at all of the — all of the appointments or meetings I had with Leo.

Kaup said that there was a point in time that he believed that Mary Ann was Leo's biological daughter, because he knew that Gertrude, Mary Ann's mother, lived with Leo and Bill and he "assumed [Leo or Bill] was her father."

Kaup said that he observed the interactions between Leo and Mary Ann, and he described their interactions:

> Early on Leo [and] Mary Ann would come in and Leo would make the decisions, would sometimes ask Mary Ann what she thought. . . . I'd say in the last five, six, seven years, she became more involved. He would ask her early on what she thought. At the end it was I think relying a lot more on do you think this is [what] I need to do and we'll do it.

Kaup stated that Leo relied on Mary Ann and that he could not "recall any other uncle/niece relationships similar to this one." He stated that Leo provided "substantial financial assistance" to Mary Ann, including substantial gifts. Kaup stated that he would not have expected Leo "to make expressions verbally or in writing referring to Mary [Ann] as, quote, his daughter or words to that effect." Kaup stated that Leo never referred to Mary Ann as his daughter, but that "in the relationship . . . how they handled investment decisions and even some of the estate planning [Kaup] was involved in [was] very

similar to what [Kaup] worked with with other clients who work with their children." On cross-examination, Kaup stated that Bill was one of his clients as well and that Mary Ann had "a similar relationship to Bill as she did to Leo."

Patrick then testified on the behalf of Mary Ann and himself. He stated that Leo had been his great-uncle and that Mary Ann was his mother. He described Leo's relationship with Mary Ann: "Well, they — he's basically taking care of her and she's taking care of him in the later years." Patrick testified that Leo "always looked out for [Mary Ann]" financially and that "she was always there for him." He stated, "It seemed like whenever he had to go to the doctor or anything it was — [Mary Ann] always took care of Leo. The meals, everything . . . the last 20 years she's been there every day."

Patrick said that he grew up in Lincoln and that he first came to know Leo "on holidays and in the summertime." Patrick stated that in the summer, he came back and helped Leo work on the ranch, and that he would "stay out there at the ranch all summer." Patrick said that Leo gave Mary Ann advice, such as "always save your money and how to invest it and don't spend it . . . on silly stuff." After high school, Patrick moved back to Atkinson to work on the ranch, and he had contact with Leo on a daily basis. Patrick said that Leo was like a father to Mary Ann and that "he was the . . . main figure," the one who "made the final decisions."

On cross-examination, Patrick stated that both Bill and Leo cared about Mary Ann and that on most days, Mary Ann would see Bill, Leo, and Gertrude. Patrick was asked if there "[w]as . . . something that would cause [him] to say that Bill or Leo was more of a father figure to Mary Ann, that one of the two was more of a father figure than the other one," and Patrick stated, "Just that Leo was more of the boss . . . . He made the final call." Patrick said that Bill and Leo were equally loving and affectionate toward Mary Ann.

The State called Father Steffes to testify on its behalf. Father Steffes stated that he was personally familiar with both Mary Ann and Leo. He stated that upon Mary Ann's request, he had written a letter dealing with Mary Ann's relationship with Leo. Father Steffes testified that he had written that Mary Ann had

told him "having several men playing the father figure was normal to her," and he testified that Mary Ann had told him she viewed more than one of her uncles as a father figure. Father Steffes stated that he never discussed with Leo whether he was in a father-daughter relationship with Mary Ann.

On cross-examination, Father Steffes stated that he "looked upon [the relationship between Mary Ann and Leo] as [a father-daughter relationship] just simply because Mary Ann looked after him all those years and she was close to him . . . and cared about him and all that stuff and took good care of him as she did [Gertrude]." Father Steffes said that the relationship "was closer than [uncle and] niece just because she . . . became [Leo's and Gertrude's] caretaker from what I could see." On examination by the court, Father Steffes conceded that he never thought of Mary Ann's relationship with Leo as a father-daughter relationship, "because I knew it was uncle/ niece." Father Steffes' letter was entered into evidence, and the letter contains the following statement: "From what I can gather, Gertrude, Leo and the others served in the parental role for Mary Ann . . . . In later years, Mary Ann and Pat[rick] took over the role of caring for Gertrude and Leo as one would do for aging parents." At the conclusion of all evidence, the county court discussed several procedural matters, heard closing argument, and then took the matter under advisement.

On August 28, 2006, the county court filed an order in the instant case. In its order, the county court, after "having reviewed the evidence presented at the hearing[, found] that [Mary Ann and Patrick had] fallen short in their burden of showing that [Leo] for not less than 10 years prior to his death stood in the acknowledged relation of a parent to Mary Ann." In so finding, the county court specifically noted:

> While Mary Ann . . . resided in the home of [Leo], the evidence indicated that [she] was actually residing with her mother[, Gertrude,] who was cohabiting with her two brothers, [Mary Ann's] uncles, in a sort of communal type of setting. The Court further finds that [Leo] assumed some responsibility for the support of Mary Ann . . . and may have exercised some parental authority and discipline over [Mary Ann]. It does not appear to the Court that the

amount of support and parental authority is of such a great extent that the Court is convinced that [Mary Ann] stood in the relation of a daughter.

While not the only factor, the Court certainly notes that [Leo] apparently never acknowledged in writing or even orally that [Mary Ann] stood in the relationship of a daughter to [him].

The cases cited by [Mary Ann and Patrick] when read in comparison to the factual situation in this particular case show an overwhelming and compelling basis for making a presumptive parent-child relationship. Such evidence is wanting in the present case.

Mary Ann and Patrick have timely appealed to this court.

## ASSIGNMENT OF ERROR

Mary Ann and Patrick allege that the county court erred when it failed to find that the requisite acknowledged parent-child relationship as required by § 77-2004 existed between Leo and Mary Ann for not less than 10 years prior to his death.

## STANDARD OF REVIEW

The scope of review in an appeal of an inheritance tax determination is review for error appearing on the record. *In re Estate of Kite*, 260 Neb. 135, 615 N.W.2d 481 (2000). See *In re Estate of Ackerman*, 250 Neb. 665, 550 N.W.2d 678 (1996). Factual findings necessary in determining if the requisite acknowledged parent-child relationship of § 77-2004 exists should be reviewed for sufficient evidence and should not be disturbed on appeal unless clearly wrong. *In re Estate of Kite, supra*. See *In re Estate of Ackerman, supra*.

In making this determination, an appellate court considers that the trial judge observed and heard the witnesses and accepted one version of the facts rather than another. See *In re Estate of Kite, supra*.

## ANALYSIS

Mary Ann and Patrick allege that the trial court was clearly wrong in determining that Mary Ann had failed to carry her burden of showing that Leo, for not less than 10 years prior to his death, stood in the acknowledged relation of a parent to Mary Ann.

Section 77-2004 provides, in relevant part, that "any person to whom the deceased for not less than ten years prior to death stood in the acknowledged relation of a parent" shall receive an inheritance tax exemption of $10,000 and shall be taxed at the rate of 1 percent of the clear market value of the inherited property thereafter. Conversely, Neb. Rev. Stat. § 77-2005 (Reissue 2003) provides:

> In the case of an uncle, aunt, niece, or nephew related to the deceased by blood or legal adoption, or other lineal descendant of the same, or the spouse or surviving spouse of any of such persons, the rate of tax shall be six percent of the clear market value of the property received by each person in excess of two thousand dollars and not exceeding sixty thousand dollars; and on all the excess over sixty thousand dollars, the rate of tax shall be nine percent.

■ Statutes exempting property from inheritance tax should be strictly construed, and the burden is on the taxpayer to show that he or she clearly falls within the language of the statute. *In re Estate of Ackerman, supra.* Therefore, the burden of proof at the trial level was on Mary Ann and Patrick to clearly establish that Mary Ann was a person to whom Leo for not less than 10 years prior to death stood in the acknowledged relation of a parent.

■ In order to determine whether the evidence establishes such a parental relationship, it is necessary to analyze the scope of the statutory language, "'acknowledged relation[ship] of a parent.'" *In re Estate of Kite*, 260 Neb. 135, 140, 615 N.W.2d 481, 485 (2000). This language has been held to extend beyond blood relatives to persons standing "'in loco parentis'" with the taxpayer. *Id.* Residency in the testator's home is not required to be a person to whom the testator for not less than 10 years prior to death stood in the acknowledged relationship of a parent. *Id.* Although a natural parent-child relationship may exist elsewhere, if the parties regard each other in all of the usual incidents and relationships of family life as parent and child, the benefits of § 77-2004 should flow. *In re Estate of Kite, supra.* In determining whether a person stands in loco parentis to another within the context of § 77-2004, a person may stand in loco parentis despite other sources of support for

the child, and our determination of the nature of the relationship between the testator and the taxpayer is not limited to an examination of the childhood years of the taxpayer. *In re Estate of Kite, supra.*

In making its determination that Mary Ann had not carried her burden of showing that she was entitled to the aforementioned inheritance tax exemption, the county court specifically found:

> While Mary Ann . . . resided in the home of [Leo], the evidence indicated that [she] was actually residing with her mother[, Gertrude,] who was cohabiting with her two brothers, [Mary Ann's] uncles, in a sort of communal type of setting. The Court further finds that [Leo] assumed some responsibility for the support of Mary Ann . . . and may have exercised some parental authority and discipline over [Mary Ann]. It does not appear to the Court that the amount of support and parental authority is of such a great extent that the Court is convinced that [Mary Ann] stood in the relation of a daughter.
>
> While not the only factor, the Court certainly notes that [Leo] apparently never acknowledged in writing or even orally that [Mary Ann] stood in the relationship of a daughter to [him].
>
> The cases cited by [Mary Ann and Patrick] when read in comparison to the factual situation in this particular case show an overwhelming and compelling basis for making a presumptive parent-child relationship. Such evidence is wanting in the present case.

In *In re Estate of Ackerman*, 250 Neb. 665, 674, 550 N.W.2d 678, 684 (1996), the Nebraska Supreme Court concluded that the factors that a trial court should consider in arriving at the determination that an acknowledged relationship of a parent does or does not exist include, but are not limited to, the following guideposts:

> (1) reception of the child into the home and treatment of the child as a member of the family, (2) assumption of the responsibility for support beyond occasional gifts and financial aid, (3) exercise of parental authority and discipline, (4) relationship by blood or marriage, (5) advice and

guidance to the child, (6) sharing of time and affection, and (7) existence of written documentation evincing the decedent's intent to act as parent.

The Supreme Court further noted that "[a]ny list of suggested criteria is not meant to be exhaustive, nor will every factor necessarily be present in each case." *Id.* Thus, in light of the preceding factors, we must examine the record to determine if the county court was clearly wrong in its determination that Mary Ann did not qualify for the inheritance tax exemption provided in § 77-2004.

The trial court specifically found that Leo did not exactly take Mary Ann into his home; rather, the court believed that Mary Ann primarily lived with her mother, Gertrude, and that Leo, Bill, Gertrude, and Mary Ann all lived together in a "communal type of setting." There is evidence in the record to support this finding, and we are unable to say that this factual finding is clearly wrong.

The county court held that Leo "assumed some responsibility for the support of Mary Ann," and the evidence in the record supports this finding. Mary Ann testified that as she grew up, "the expenses for [her] clothing, food, utilities and shelter [were] a shared expense between" Leo, Gertrude, and Bill. There was also evidence that after she was an adult, Mary Ann received financial assistance from Leo. However, the court found that "the amount of support . . . is [not] of such a great extent that the Court is convinced that [Mary Ann] stood in the relation of a daughter" to Leo. We cannot say that this factual finding is clearly wrong, as it does appear that the expenses for raising Mary Ann were shared between a number of family members, including Gertrude, Bill, and Leo.

Mary Ann testified that Leo would discipline her, that he did not ask Gertrude before he disciplined Mary Ann, and that Mary Ann "always had great respect for anything that [Leo] said." The record also reveals that Gertrude would often defer to Leo's opinion when Mary Ann asked to do something. The county court concluded that Leo "may have exercised some parental authority and discipline over [Mary Ann]." However, the court further noted that "[i]t does not appear to the Court that the amount of . . . parental authority is of such a great extent that

the Court is convinced that [Mary Ann] stood in the relation of a daughter." Again, there is evidence in the record to support the court's factual finding, and we cannot say that the finding is clearly wrong.

The next two factors are certainly in favor of a finding that Leo stood "in loco parentis" to Mary Ann. There is nothing in the record to suggest that Leo was not related by blood to Mary Ann, and there is ample evidence in the record indicating that Leo provided advice and guidance to Mary Ann throughout her experience with him. When Mary Ann was a child, Leo taught her to do chores and farmwork, and when Mary Ann was an adult, Leo gave her financial advice and guidance, as well as general life lessons.

There can similarly be little disagreement over whether Mary Ann shared a great deal of time with Leo. The record indicates that Mary Ann, as a child, spent her time working with Leo on the farm and that Leo took her on vacations. After Mary Ann married and moved to Lincoln, the time spent with Leo diminished, although she did see him once a month and on holidays. In 1983, Mary Ann moved back to Atkinson, and from that time until the end of Leo's life, it appears that Mary Ann saw Leo on almost a daily basis. There was little evidence presented at trial regarding affection between Leo and Mary Ann, although the evidence presented did tend to indicate that Leo was not particularly physically or verbally affectionate toward anyone. However, it is reasonable to infer from the evidence presented that Leo and Mary Ann had affection for one another.

Finally, the county court noted the following: "While not the only factor [Leo] apparently never acknowledged in writing or even orally that [Mary Ann] stood in the relationship of a daughter to [him]." This finding by the trial court is not clearly wrong. None of the witnesses testified that they heard Leo refer to Mary Ann as his daughter, and none of the documents entered into evidence contained such a written acknowledgment. Mary Ann did not say that Leo referred to her as his daughter, and she did not refer to him as her father, although she said that she "consider[ed] Leo . . . to be like a father" to her and that it was her "perception that Leo . . . considered [her] to be like a daughter to him." Further, it appears from the record that Mary Ann

had many "father figures," as she indicated to Father Steffes that "having several men playing the father figure was normal to her," and that she had viewed more than one of her uncles as a father figure. Additionally, Mary Ann conceded that had Leo passed away before Bill, she would have claimed that she had a father-daughter relationship with Bill.

The fact that Leo never acknowledged in writing or even orally that Mary Ann stood in the relationship of a daughter to him differentiates the instant case from the factual scenarios seen in both *In re Estate of Ackerman*, 250 Neb. 665, 550 N.W.2d 678 (1996), and *In re Estate of Kite*, 260 Neb. 135, 615 N.W.2d 481 (2000). In each of those cases, the Nebraska Supreme Court found that the petitioner had sustained his or her burden of proof under § 77-2004, and in each case, most of the factors listed in *In re Estate of Ackerman* were present. However, in each case, the testator had acknowledged, in writing or verbally, a parent-child relationship with the petitioner. Such an acknowledgment is absent here.

In no way do we wish to diminish the relationship between Mary Ann and Leo. The record certainly proves that they loved and cared for one another. However, given the preceding factors, and giving weight to the fact that the trial judge observed and heard the witnesses and accepted one version of the facts rather than another, we cannot say that the trial court was clearly wrong when it concluded that Mary Ann did not qualify for the inheritance tax exemption provided in § 77-2004. This assignment of error is without merit.

## CONCLUSION

We conclude that the county court was not clearly wrong when it found that Mary Ann had failed to carry her burden of showing that she was a person to whom Leo for not less than 10 years prior to his death stood in the acknowledged relation of a parent, and we accordingly affirm the judgment of the county court.

AFFIRMED.